610 So.2d 1359 (1992)
Keith Anthony KELVIN, Appellant,
v.
STATE of Florida, Appellee.
No. 91-2627.
District Court of Appeal of Florida, First District.
December 30, 1992.
*1361 Nancy A. Daniels, Public Defender, David P. Gauldin, Asst. Public Defender, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen., Bradley R. Bischoff, Asst. Atty. Gen., Tallahassee, for appellee.
ERVIN, Judge.
Appellant, Keith Anthony Kelvin, appeals his convictions for first-degree murder and attempted first-degree murder, raising 11 issues on appeal: Whether the trial court erred in (1) admitting a statement Kelvin made to a law enforcement officer following a prior arrest; (2) denying appellant's renewed motion for change of venue; (3) rebuking defense counsel in front of the venire; (4) refusing to excuse the wife of a deputy sheriff for cause from the venire; (5) allowing one of the officers who was wounded in the gun battle involved in this case to testify that he was disabled as a result of this incident; (6) commenting on certain aspects of the evidence during trial; (7) instructing the jury on flight; (8) admitting expert testimony about a photograph of a sofa with dowels sticking into it; (9) admitting evidence of other crimes, wrongs, or acts; (10) permitting the prosecutor to make improper statements during opening statement and closing argument; and (11) failing to grant appellant's motion for judgment of acquittal on the charges of first-degree murder and attempted first-degree murder. We affirm issues 1 and 11; reverse issues 6, 7, 8, 9, and 10, and remand the case for new trial. Due to our disposition of the above issues, we consider it unnecessary to consider issues 2, 3, 4, and 5.
At approximately 9:00 p.m. on July 26, 1990, Jacksonville Sheriff's Office Patrolmen Kirk Clark and Warren Sanders went to Yellow Pine Court in an unmarked white truck on special assignment, wearing undercover clothing and bulletproof vests. The officers observed Lasean Dunnell and Tony Hamilton standing among a group of men at the nearby Cyprus Court Apartments and concluded that they were selling drugs. Believing they had been recognized by the men, the officers then decided to arrest Dunnell and Hamilton. Clark testified that he blocked the suspects' car with his truck, got out with his gun drawn, and yelled, "Mother-f____, don't move, it's the police." Dunnell began walking slowly toward apartment number two until Clark told him to stop, whereupon Dunnell ran toward the apartment yelling "99," a street term for "police." Dunnell ran into the apartment, closing the door behind him.
In hot pursuit, Clark kicked the door open without checking whether it was locked and without identifying himself as a police officer. Clark testified that once inside, a barrage of shots was fired in his direction, and that he saw a man, later identified as appellant Keith Kelvin, squatting in a corner shooting at him. Clark returned the fire and had his legs shot out from under him. He fell and was shot two more times. He then raised himself up and, intending to shoot at the suspect, instead shot Officer Sanders, who had followed him into the apartment. Sanders said, "God damn it, Clark," and fell backward onto the floor. Clark crawled to the door where he remained until Officer J.C. Tranquille came in.
Officer Sanders died of multiple gunshot wounds with perforations of vital organs and hemorrhaging. Three of his 15 wounds were fatal or potentially fatal; four of the six bullets recovered from his body were from Officer Clark's gun, and the other two were traced to the weapon that Dunnell testified was owned by Kelvin. Clark was shot six times.
Lasean Dunnell testified on behalf of the state that he had known Kelvin for about two months before the incident. Over defense *1362 objection, Dunnell said he was selling crack cocaine that evening in order to pay Kelvin $400 he owed him for some other cocaine which he had obtained from Kelvin and that Kelvin knew Dunnell was selling drugs that night to pay the debt. The court gave a Williams[1] rule instruction advising the jury that such evidence was offered for the limited purpose of proving motive, opportunity, etc. Dunnell continued that he saw the white truck parked across the street, and that Kelvin was sitting in front of apartment number two at the time, the apartment of Elaine Brown, with a gun in his pocket. Dunnell said that when someone jumped out of the driver's side of the truck yelling "police," Dunnell ran toward apartment number two, shouting "9," also a street term for police. Dunnell testified that he, Kelvin, and Gerald Brown ran into the apartment where Elaine had friends in the front room, and that the door was immediately kicked in by Officer Clark, whom he recognized. He said that Kelvin immediately shot Clark in the leg, that Clark fell over, and that Kelvin shot Clark a couple of more times while Clark was on the floor. He said Officer Sanders then came in the door pointing his gun at Dunnell, that Sanders did not shoot at Dunnell, and that several persons began shooting at that time,[2] including Kelvin who was firing at Sanders. Dunnell then ran out the back door.
On cross-examination, Dunnell testified that when the men jumped out of the unmarked truck, he did not know that they were police, even if he had yelled "9." He said he thought they might be "jackmen" or robbers because he heard someone shout "jackmen" as the officers left the truck. In fact, he denied knowing at any time while he was running toward the apartment that the two men were police officers and not robbers, and testified that he was afraid for his life as he ran, because he knew that "jackmen" shoot. Dunnell testified he heard Clark say, "Mother-f____, don't run," but that Clark did not say "police." He said that after he was inside the apartment, he still did not know whether the two men were police officers or robbers, and that he was even more frightened when he saw the person who had been chasing them kick the door open with a gun in hand. Dunnell said that he had been robbed twice in the same apartment complex two weeks before, first by three armed men and the second time by eight armed men. He said that Kelvin knew about the first robbery and was in a position to have observed the second. In addition, contrary to his testimony on direct, Dunnell denied having any actual knowledge whether Kelvin had in his possession a firearm while he was sitting in the chair outside the apartment.
Officer Tranquille testified that when he arrived on the scene he went to apartment number two and found both officers lying in a pool of blood. He testified that no one told him that the persons who had been shot inside the apartment were police officers, and that the only indications to that effect were the handcuffs which Sanders had on his belt and the bulletproof vests both men were wearing beneath their shirts.
Over objection, the following evidence was introduced on the issue of defendant's motive behind the shooting. Detective Varner testified that on June 30, 1990, while he was working undercover, he sold Kelvin some marijuana, and then arrested him and informed him of his constitutional rights. He described Kelvin as acting belligerently, saying to him that the "next time he wouldn't go as peacefully." Prior to trial, the court denied Kelvin's motion to suppress this testimony.
The state also theorized that Kelvin shot the two police officers to avoid being apprehended because he was on bond for the marijuana charge at the time of the shooting, he had a previous New York felony conviction, and/or he had immigration problems. Evidence was accordingly introduced showing that Kelvin had posted bond *1363 on July 1, 1990 for the earlier marijuana charge, and that bond was not released therefor until August 21, 1990; that Kelvin had been convicted of a felony in New York; and that Kelvin, who is from Guyana, had been issued an order of deportation dated March 22, 1988. The significance of all the above, according to the state, was that Kelvin would have been taken into custody and his bond cancelled if he had been arrested; therefore, Kelvin obviously had a motive to resist arrest, even with deadly force.
Elaine Brown testified on behalf of appellant, stating that on July 26, 1990, she lived at apartment number two, Cyprus Court Apartments, with her daughter and Keith Kelvin, and on that night Kelvin was sitting outside the apartment in front of the open door, while she was entertaining two guests inside the apartment. She heard a noise which sounded like children playing and went into the living room where she heard shooting; then she and her guests left by the back door. Brown and each of the guests testified that they did not hear anyone shout "police" or "9," and they did not know that the man who broke open the door was a police officer. Brown stated that she and Kelvin had witnessed an apparent robbery a couple of weeks before by people who yelled "vice," and that some men had jumped out of a car and shot at the apartment located opposite hers a couple of nights earlier.
Gerald Brown testified that he was standing by a tree the night of the incident, and he believed that robbers were inside the pickup truck. He had been robbed previously. He said that Officer Clark had stopped him a number of times; that he never had any reason to run from him; that he never saw Clark out of uniform or in an unmarked car before; and that he did not recognize Clark as the man who got out of the truck, who never identified himself as a police officer but merely instructed Brown and his acquaintances not to run. Brown and Kelvin went into apartment two, and when the door was kicked in, Brown ran out the back door. He never saw a gun on Kelvin before or during the shooting.
Derrick Martin, another member of the group outside the apartment, testified that he was with Dunnell, Brown, and others that night, and that when the two men jumped out of the truck, he believed they were robbers. He also denied hearing the two men identify themselves as police officers, but did hear someone yell "jackmen." He had been robbed two weeks before.
On rebuttal, Detective Herb Scott testified that when he interviewed Elaine Brown on the night of the incident, she never mentioned that Kelvin lived with her and her daughter. He admitted on cross-examination that he treated Brown as a hostile witness that night.
Kelvin was found guilty of first-degree murder and attempted first-degree murder with use of a firearm. He was sentenced to life in prison with a 25-year minimum mandatory for the first-degree murder offense, and life in prison with a three-year minimum mandatory sentence to run consecutive to his sentence for attempted first-degree murder with a firearm.
As to issue 1, we conclude that Detective Varner's testimony regarding appellant's prior belligerent statement upon arrest was relevant to show appellant's premeditated intent to use deadly force during this incident, and we affirm as to this point. See Ruffin v. State, 397 So.2d 277, 280 (Fla.) ("Evidence of other crimes is relevant if it casts light on the character of the crime for which the accused is being prosecuted."), cert. denied, 454 U.S. 882, 102 S.Ct. 368, 70 L.Ed.2d 194 (1981). We reject as well Kelvin's constitutional argument asserting that his self-incriminating statement should have been suppressed because it was made in contravention of Miranda.[3] Suppression is required only when statements are obtained through interrogation; it does "not apply to volunteered statements initiated by the suspect." Traylor v. State, 596 So.2d 957, 966 (Fla. 1992). The record shows that Kelvin's defiant statement was voluntary and was not a *1364 response to interrogation; therefore, we are not confronted with whether Kelvin knowingly waived his privilege against self-incrimination. See, e.g., State v. Foster, 562 So.2d 808 (Fla. 5th DCA 1990); Rivera v. State, 547 So.2d 140 (Fla. 4th DCA 1989), cert. denied, 558 So.2d 19 (Fla. 1990).
As to issue 6, we conclude that the trial court improperly commented on the evidence and erroneously precluded appellant from pursuing a relevant line of questioning. During the cross-examination of Officer Clark, while defense counsel was attempting to question Clark about his use of profanity when he first approached the men whom he suspected of selling drugs, the trial judge interrupted, saying, "I don't know why the state isn't objecting, but I'm going to start objecting. This is going to be a long trial, let's go on to something more relevant; Okay?" It appears from the record that defense counsel was trying to develop the argument that Clark's use of profanity while chasing Dunnell was not proper police procedure, thereby lending credence to his defense that Kelvin believed that Clark and Sanders were apparently robbers rather than police officers. The judge's comment had the appearance of indicating skepticism as to this version of events, which was improper.
We also reverse on issue 7, relating to the trial court's erroneous instruction to the jury on flight. The evidence discloses that following the gun battle, Kelvin climbed out an upstairs window, jumped to the ground, ran to a ditch where the gun was later recovered, and proceeded to an apartment complex four or five blocks away and there called a friend who picked him up and checked him into a motel. Kelvin thereafter went to Miami where he contacted an attorney and turned himself in. Over an objection by defense counsel, the court instructed the jury on flight.
Regardless of the applicability of the instruction on the merits, the supreme court in Fenelon v. State, 594 So.2d 292 (Fla. 1992), held that a flight instruction constitutes an improper comment on the evidence and directed "that henceforth the jury instruction on flight shall not be given." Id. at 295. Although Fenelon had not been decided when the trial of the case at bar took place in May 1991, its holding must be applied retrospectively because Fenelon was decided during the time that Kelvin's conviction was pending on appeal. See Smith v. State, 598 So.2d 1063 (Fla. 1992). Accord Keys v. State, 606 So.2d 669 (Fla. 1st DCA 1992); Brown v. State, 609 So.2d 656 (Fla. 3d DCA 1992).[4]
We reverse as well as to issue 8, pertaining to the court's erroneous admission of expert testimony. The court admitted into evidence a photograph of a sofa located in the apartment where the shooting occurred, showing long dowels stuck through purported bullet holes in the sofa, resting up against bullet holes in the wall. Over objection, the court permitted Dwight Morrow, an evidence technician, to testify that the dowels showed the flight path of some of the bullets that had been fired in the apartment. Morrow admitted he was not a reconstructionist and had no training in ballistics. We therefore conclude that he was unqualified to testify as to the trajectory of the bullets as depicted by the dowels in the photograph. Cf. Floyd v. State, 569 So.2d 1225, 1232 (Fla. 1990) (police officers were not qualified to testify that stab wound on victim's hand was a defensive wound), cert. denied, ___ U.S. ___, 111 S.Ct. 2912, 115 L.Ed.2d 1075, 115 L.Ed.2d 1075 (1991); Gilliam v. State, 514 So.2d 1098, 1100 (Fla. 1987) (medical examiner was not expert in shoe-pattern evidence; thus, she was not qualified to testify about marks on decedent).
We next turn to issue 9, regarding whether the trial court erroneously admitted evidence of prior wrongs or acts, which the state maintained was relevant to show Kelvin's motive to flee from the police and *1365 engage in the ensuing gun battle.[5] First, the court admitted testimony which revealed that Kelvin had a felony conviction in New York, based on the state's theory that Kelvin had shot the officers because he did not want to be apprehended while carrying a firearm, which is a criminal offense for a convicted felon.[6] Second, evidence was admitted showing that Kelvin was a citizen of Guyana and was appealing a deportation order requiring him to return to that country. The state theorized that Kelvin shot the officers to avoid the deportation which might have occurred had he been apprehended in possession of a firearm. Finally, the court permitted testimony that Kelvin had posted a $1,500 bond for his June 30, 1990 arrest, and that he remained out on bond as of the date of the incident. The state contended that Kelvin's bond would have been revoked had he been "caught doing something," so he shot the officers to avoid this possibility. If there was any probative value in admitting such speculative evidence  and we find it to be weak at best  we consider its value far outweighed by its prejudicial effect. See, e.g., Drake v. State, 400 So.2d 1217 (Fla. 1981) (reversible error for court to permit evidence in homicide case of previous sexual battery and attempted sexual battery for the purpose of showing that defendant murdered victim in order to avoid revocation of parole).
Turning to the trial court's admission of evidence disclosing that Kelvin was in the drug business with Dunnell, we agree that such evidence was admissible to show the relationship between the men who fled from Officers Clark and Sanders, the entire context out of which the homicide arose, and Kelvin's possible motive for fleeing and firing upon his pursuers. Jackson v. State, 522 So.2d 802 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 183, 102 L.Ed.2d 153 (1988); Craig v. State, 510 So.2d 857 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 732, 98 L.Ed.2d 680 (1988).
Finally, Kelvin urges in issue 10 that the prosecutor engaged in an improper opening statement and closing argument. In his opening statement, the prosecutor commented that Sanders gave up his life and Clark almost gave up his "while serving the citizens of Duval County"; that as police officers they were attempting "to do their part in battling or dealing with the drug problem"; that Dunnell had a "business relationship" with Kelvin; that Kelvin ran from the police because of his arrest "on June 30th by an undercover officer"; that Kelvin was a convicted felon; and that the evidence would show why Kelvin fled that night. In closing argument, the prosecutor argued that "defendant's spot" was in front of Brown's apartment; that it was his "drug kingdom" and the young kids out there were his pawns; that he was the "king maker"; that he was a convicted felon; that he was out on bond for the prior arrest when he committed the crimes in this case; that Kelvin couldn't legally possess a gun; and that he had been ordered deported "in case there's any issue about whether he knew they were police officers and whether he ran from them."
While we agree that many of these statements were improper, Kelvin did not object to most of the prosecutor's statements during his opening, and objected to none during closing argument; therefore these potential errors were waived. State v. Cumbie, 380 So.2d 1031 (Fla. 1980). He did, however, object to the prosecutor's statement during opening stating that the officers were attempting to battle the drug problem that night, but he failed to move for mistrial. An objection without a motion for mistrial is considered a waiver. Id. at 1033. Kelvin later moved for a mistrial when the prosecutor stated that Kelvin ran *1366 from the police because of his previous arrest on June 30th. We previously concluded under issue 9 that evidence of the latter was improperly admitted as evidence of motive; consequently, the combination of this error with the other errors recounted in this opinion warrants reversal and remand for new trial.
In issue 11, Kelvin contends the evidence was insufficient to convict him of first-degree murder, and that his motion for judgment of acquittal should have been granted. He argues that the evidence does not establish that Kelvin knew that Sanders and Clark were police officers, thus he was entitled to be acquitted on both charges under the "castle doctrine," recognizing that a man's home is his castle, and that he may therefore use deadly force to protect it from attack. On the contrary, sufficient evidence was submitted to raise a jury question on this issue and to defeat Kelvin's motion for judgment of acquittal. Application of the "castle doctrine" was a factual question to be determined by the jury. Strange v. State, 579 So.2d 859 (Fla. 1st DCA) (evaluation of evidence of self-defense is a function of the trier of fact), review denied, 591 So.2d 184 (Fla. 1991).
Because we conclude that a number of the above issues requires reversal of appellant's conviction and a remand of the case for new trial, we consider a number of other issues raised by appellant to be mooted by our disposition. Nevertheless, in that this case must be retried, we regard comment on some of the points raised to be helpful. In his third issue, appellant contends that the trial judge committed reversible error by rebuking appellant's counsel in front of the jury. During jury selection, defense counsel was two minutes late following a break due to co-counsel's difficulty in going through a metal detector inside the courthouse caused by a metal plate in his head. When the attorney returned to the courtroom, the judge said, in front of the jury panel, "You do it one more time, you're going to leave the courtroom. You'll be right back there in the [jail] chute where I'll know where you are; you understand that? ... There's no excuse for it." Although we do not consider this statement sufficiently egregious to constitute reversible error, we do note that it is inappropriate to admonish counsel in such manner in the presence of the jury. Additionally, we take issue with the trial court's repeated refusal to permit defense counsel to approach the bench in order to make objections outside the hearing of the jury.
In issue 4, appellant argues that the trial court should have excused veniremember Spaulding for cause. Mrs. Spaulding was married to a sergeant in the Jacksonville Sheriff's Office and indicated that she believed her husband had discussed the instant case with her shortly after the incident occurred. Because we are remanding for new trial, this issue is moot. Nevertheless, we note that the failure to excuse this potential juror for cause constituted an abuse of discretion.
AFFIRMED IN PART, REVERSED IN PART, and REMANDED for new trial.
ZEHMER and BARFIELD, JJ., concur.
NOTES
[1] Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959).
[2] Dunnell denied firing any shots, stating he did not have a firearm.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] Although in Fenelon the court decided that giving the instruction was harmless error, the state in the case at bar failed to present any argument on this point. We therefore decline to conclude that the jury was not influenced by the error. Ciccarelli v. State, 531 So.2d 129 (Fla. 1988); Lee v. State, 508 So.2d 1300 (Fla. 1st DCA 1987), approved, 531 So.2d 133 (Fla. 1988).
[5] The parties characterized this as Williams rule evidence, yet there is nothing similar about Kelvin's felony conviction, deportation order, marijuana charge, and the facts in this case. The question of whether such evidence was correctly admitted is resolved simply by determining its relevancy. See Bryan v. State, 533 So.2d 744, 746 (Fla. 1988), cert. denied, 490 U.S. 1028, 109 S.Ct. 1765, 104 L.Ed.2d 200 (1989).
[6] The court took judicial notice of and read to the jury Section 790.23, Florida Statutes, which provides that it is unlawful for a person convicted of a felony in any state to possess a firearm.