804 So.2d 316 (2001)
Thomas WOODEL, Appellant,
v.
STATE of Florida, Appellee.
No. SC95110.
Supreme Court of Florida.
December 20, 2001.
*318 James Marion Moorman, Public Defender, and Robert F. Moeller, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Carol M. Dittmar, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing a death sentence upon Thomas Woodel. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm the convictions but vacate the two death sentences and remand with *319 instructions that there be a new sentencing proceeding before the trial court in accord with the procedures set forth in Jackson v. State, 767 So.2d 1156, 1160-61 (Fla.2000).

FACTS
A Polk County grand jury returned a four-count indictment against Thomas Woodel, charging him with first-degree murder of Clifford Moody, first-degree murder of Bernice Moody, armed robbery, and armed burglary. A jury convicted Woodel on all four counts.
Clifford Moody, who was seventy-nine years old, and his seventy-four year old wife, Bernice, lived in a mobile home trailer on lot 533 at Outdoor Resorts of America in Polk County. The Moodys owned another trailer on adjoining lot 532, which they sometimes rented. Bernice was seen by the newspaper delivery man cleaning lot 532 about 4:30 to 4:45 a.m. on December 31, 1996. Clifford was last seen by a security person at the Outdoor Resorts Laundromat at about 5:30 a.m. The Moodys were preparing to show the mobile home for rental that day.
The Moodys were found dead a little after 1 p.m. on December 31, 1996. Clifford was found lying on his back in the dining room area of the trailer on lot 532. His underwear and pants had been pulled down to below his knees. His eyeglasses lay approximately two feet from his head. Dr. Alexander Melamud, the medical examiner, testified that Clifford received a total of eight stab wounds, causing more internal than external bleeding, and that he died as a result of these stab wounds close in time to his wife's death.
Bernice was found in the same trailer with multiple stab wounds. She lay dead on a bed in the back of the trailer and was nude except for one sock. A nightgown and female underwear with a knot tied in it lay on the floor next to the bed. Additionally, pieces of a porcelain toilet tank lid were found underneath her. Dr. Melamud testified that Bernice incurred a total of fifty-six cut or stab wounds, many of which on her right arm he opined to be defensive. Her jugular vein had been slit. Additionally, she had received significant blunt trauma injuries to her head, and her nasal bones were fractured. Dr. Melamud testified that Bernice died as a result of her injuries sometime in the early morning hours of December 31, 1996. No semen was detected on Bernice.
With the permission and assistance of Outdoor Resorts, detectives searched the park's dumpsters the morning of January 3, 1997. The dumpsters had not been emptied since prior to December 31, 1996. During the search, detectives found three garbage bags containing pieces of a porcelain toilet tank lid, a wallet containing Clifford's identification and credit cards, keys with a tag stating "Cliff's keys," glasses, bloody socks, paperwork with the address of lot 301, and paperwork bearing the names of the defendant and his son, Christopher Woodel.
That afternoon, detectives went to lot 301. Woodel lived there with his long-time girlfriend, Christina Stogner, and his sister, Bobbi Woodel. Woodel and his sister signed consent forms to have their trailer searched. Stogner was out of town at that time. Also present that day at lot 301 was Gayle Woodel. Although not known at that time, it would later be discovered that Gayle married Woodel in 1989, and they had a son together, Christopher. Gayle and Woodel separated in 1992 but never divorced. In 1996, Gayle and Christopher lived in North Carolina while Woodel lived in Florida. However, Gayle had just come to Florida from North Carolina so that Christopher could spend some time with Woodel. Gayle, Christopher, and two of *320 Gayle's friends were staying at Woodel's trailer.
While some detectives searched the premises, Woodel agreed to be questioned by other detectives. As Woodel left with the detectives, Woodel went over to Gayle and whispered for her to get rid of the knife Woodel had hidden. Gayle told Woodel's landlady and friend about the content of the communication. Gayle later told deputies as well.
The detectives gave Woodel Miranda warnings, and he consented to talk with them. He initially told the detectives that he had been home asleep at the time of the murders. After further questioning, Woodel began to write out a statement. He then stopped and confessed to killing the Moodys, whom he said he had never met. The detectives then tape-recorded Woodel's confession. In this taped confession played for the jury, Woodel admitted to drinking with others that evening after work in the lot next to the Pizza Hut where he worked. Afterwards, Woodel walked to Outdoor Resorts, a little over a mile from the Pizza Hut. Woodel admitted to entering the Moody's rental trailer early in the morning after seeing Bernice through the window. He said he went in to ask for the time. According to Woodel, Bernice was alone in the trailer. Upon seeing him, she came at him with a knife, over which Woodel soon gained control. He then proceeded to stab her many times and hit her over the head with a porcelain toilet tank lid one to three times. The toilet lid shattered.
Clifford was last seen doing laundry at the Laundromat by security guard Elmer Schultz between 5:30 and 5:40 a.m. In his confession, Woodel said that he was leaving the trailer when Clifford came inside. Woodel then stabbed Clifford. As Clifford lay on the floor, Woodel picked up a bucket and placed pieces of the shattered toilet tank lid in it. He also placed the knife along with several other items in the bucket. Woodel said that after stabbing Clifford, he took Clifford's wallet.
Woodel also said in his confession that he threw some items into a canal in the mobile home park, threw some items away in his garbage, and hid the knife behind a dresser. Deputies would later find pieces of the toilet tank lid and Bernice's eyeglasses in the canal, and a knife in Woodel's room wedged between a wall and the dresser.
Jury selection began on November 9, 1998. The jury began deliberations on Thursday, December 3, and returned its verdict on Friday, December 4. The penalty phase occurred on Monday, December 7. Seventeen individuals testified, including the medical examiner, several Moody family members and friends, several Woodel family members and friends, and Dr. Henry Dee, on behalf of Woodel. After hearing this testimony, the jury recommended death by a vote of nine to three for Clifford's murder and by a twelve-to-zero vote for Bernice's murder.
The trial court followed the jury's recommendations and sentenced Woodel to death for both murder counts. The trial court found the same aggravators and mitigators for both murders. In aggravation, the trial court found that: (1) the defendant had previously been convicted of another capital offense;[1] (2) the killings were perpetrated while the defendant was engaged in a burglary;[2] (3) the killings were especially heinous, atrocious, or cruel (HAC);[3] and (4) the victims were particularly *321 vulnerable due to advanced age or disability.[4] The trial court specifically rejected that Clifford's murder occurred as a result of Woodel's effort to escape and avoid being arrested.[5] The trial court found the statutory mitigator that Woodel had no significant history of criminal activity.[6] The trial court also found seven nonstatutory mitigators: (1) Woodel was physically abused as a child; (2) he was neglected by his mother; (3) there was instability in his residences as a child; (4) both of Woodel's parents were deaf and mute; (5) use of alcohol and drugs; (6) Woodel was willing to meet with the victim's family prior to trial; and (7) he was willing to be tested for a possible bone marrow donation for his daughter, who had leukemia. The trial court specifically rejected a finding that Woodel was so intoxicated that he could not form the intent to kill.
This appeal follows, in which Woodel raises three guilt phase issues[7] and three penalty phase issues.[8]

GUILT PHASE
As his first guilt phase issue, Woodel attacks the trial court's denial of his judgment of acquittal motions related to premeditated murder and his robbery and burglary convictions. Regarding premeditation, Woodel argues that there is no direct evidence of premeditation and that the State, relying only on circumstantial evidence, failed to eliminate other reasonable hypotheses of innocence. Accordingly, he argues that the trial court should have granted his judgment of acquittal. We do not agree.
A confession is direct, not circumstantial, evidence. See Hardwick v. State, 521 So.2d 1071, 1075 (Fla.1988). This Court in Asay v. State, 580 So.2d 610, 612 (Fla.1991), defined premeditation as "a fully formed conscious purpose to kill that may be formed in a moment and need only exist for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act." In his taped confession introduced into evidence, Woodel indicated that he had reflected on his actions prior to killing Bernice. Woodel said: "I was hoping to hit her on her head to make her pass out, and then I was going to leave. I thought that's what would happen if you got hit in the head, you know." Further, Woodel smashed Bernice on the head with the porcelain toilet rim and cut or stabbed her fifty-six times, and also stabbed Clifford eight times. Based on the totality of the circumstances contained in this record, there was competent, substantial evidence upon which the jury could return a first-degree premeditated murder verdict for both murder counts. Thus, we uphold the trial court's denial of Woodel's judgment of acquittal motions regarding premeditation. See id.
We likewise uphold the robbery conviction. Woodel argues his taking of *322 Clifford's wallet was a mere afterthought that would preclude the robbery conviction. He argues that this case is controlled by Mahn v. State, 714 So.2d 391 (Fla.1998). In Mahn, this Court said that "while the taking of property after the use of force can sometimes establish a robbery we have held that taking of property after a murder, where the motive for the murder was not the taking of property, is not robbery." Id. at 397 (citation omitted). The facts in Mahn indicated that the murders in Mahn occurred because the defendant was jealous of his father's attention to the father's new wife and child, the victims in that case, and not out of a desire to take money and the car. See id.
We extensively explained our "afterthought" jurisprudence in Beasley v. State, 774 So.2d 649 (Fla.2000). In Beasley, we said:
Where an "afterthought" argument is raised, the defendant's theory is carefully analyzed in light of the entire circumstances of the incident. If there is competent, substantial evidence to uphold the robbery conviction, and no other motive for the murder appears from the record, the robbery conviction will be upheld. Conversely, in those cases where the record discloses that, in committing the murder, the defendant was apparently motivated by some reason other than a desire to obtain the stolen valuable, a conviction for robbery (or the robbery aggravator) will not be upheld.
Id. at 662 (citations omitted).
We believe Beasley and not Mahn controls in this instance. In his confession, Woodel admitted to taking Clifford's wallet just after he stabbed Clifford. Further, Clifford's wallet and keys were found in trash bags containing Woodel's garbage. In the instant case, Woodel claims that he did not know the Moodys, and no other motive for the killings is readily discernible from this record. Upon our analysis of the entire record, we find competent, substantial evidence supports the robbery conviction.
As to burglary, Woodel argues that the State failed to prove that he had an intent to commit an offense within the trailer. However, Woodel specifically states in his confession that he did not have permission to be in the trailer and that he intended to hit Bernice with the toilet lid. Accordingly, we affirm the burglary conviction.
In his second guilt phase issue, Woodel argues that the trial court impermissibly allowed constructive amendment of the indictment. Over Woodel's objection, the trial court gave the jury both premeditated and felony-murder instructions, even though the indictment only alleged premeditated first-degree murder. However, this issue has no merit. As we have stated before, "[w]e have repeatedly rejected claims that it is error for a trial court to allow the State to pursue a felony murder theory when the indictment gave no notice of the theory." Gudinas v. State, 693 So.2d 953, 964 (Fla.1997).
Woodel's final guilt phase issue concerns statements made by the prosecutor during the opening statement that improperly divulged the content of a privileged marital communication. The spousal privilege, codified in section 90.504, Florida Statutes (1995), provides in pertinent part:
(1) A spouse has a privilege during and after the martial relationship to refuse to disclose, and to prevent another from disclosing, communications which were intended to be made in confidence between the spouses while they were husband and wife.
(2) The privilege may be claimed by either spouse or by the guardian or conservator *323 of a spouse. The authority of a spouse, or guardian or conservator of a spouse, to claim the privilege is presumed in the absence of contrary evidence.
Woodel argues on appeal that the trial court should have granted his mistrial motion based upon the fact that the prosecutor divulged a marital communication to the effect that Woodel told Gayle to get rid of the knife. During his opening statement, the prosecutor said:
We'll take you back in time and go back a little bit before the defendant gave the statement because you'll recall when the officers went to his residence, he was there, but as well, there was Gayle Woodel, his ex-wife....
. . . .
But what happened was when Tom Woodel was there, getting ready to go off with the officers, he had whispered something to Gayle Woodel. He had not told her about this incident that had happened, but he had whispered to her about the knife is behind the dresser, get rid of the knife, something along those lines, which really didn't make sense to her because she did not know that he had been the person that had attacked Cliff and Bernice Moody.
This had been overheard by another person who told the officers that they had heard the defendant whispering words of this nature to his ex-wife, Gayle.
So the officers then went and spoke with Gayle. And she said, yeah, that's what he told me, was that hide the knife, get rid of the knife, it's behind the dresser, behind the dresser, something like that, but she had not gone looking for it.
The prosecutor delivered the opening statement on Tuesday, November 17, 1998. At that time, Woodel did not object to this statement. On Thursday, November 19, 1998, the prosecutor informed the trial court and defense counsel that the prosecutor had just learned that Gayle was still, in fact, married to Woodel on January 3, 1997. On the basis of that information, Woodel moved for a mistrial, citing the comment made by the prosecutor during his opening statement. The trial court denied the motion.
Woodel argues on appeal that the trial court erred by failing to grant him a mistrial based on the State's discussion of damaging inadmissible evidence. We cannot agree. We have said that the holder of the spousal privilege may waive the privilege. See Bolin v. State, 650 So.2d 19, 21 (Fla.1995) (Bolin I). A waiver occurs where the holder of the privilege consents to the disclosure of the protected communication. See Bolin v. State, 650 So.2d 21, 24 (Fla.1995) (Bolin II); § 90.507, Fla. Stat. (1995). Here, Woodel stood silent for two days after the prosecutor commented about the marital communication. Only then did Woodel move for a mistrial. Under these circumstances, we find that Woodel waived his privilege. Accordingly, the trial court did not err when denying Woodel's mistrial motion.
Even if we had not found a waiver, this issue would still be meritless for two separate reasons. First, a contemporaneous objection is needed to preserve an alleged error occurring during opening statements. See Kelvin v. State, 610 So.2d 1359, 1365 (Fla. 1st DCA 1992) (failure to object during opening statement waives error). Here, there was no contemporaneous objection. Second, assuming error, that error was not so prejudicial as to vitiate the entire trial. See Duest v. State, 462 So.2d 446, 448 (Fla.1985). Essentially, the comment was for Gayle to get rid of the knife. However, Woodel was not *324 harmed by the comment because Woodel confessed to the crime, discussed the location of the knife in his confession, and signed a consent form for the trailer to be searched. For each of these reasons, the trial court did not err in denying the mistrial motion.

PENALTY PHASE
Woodel first contends that the trial court violated his due process rights by insisting that the penalty phase be completed in one day. Alternatively, Woodel argues that this error constitutes fundamental error. Woodel maintains that exhausting and pressured circumstances are not appropriate in death cases, see Thomas v. State, 748 So.2d 970, 980 (Fla.1999), and that the trial court improperly rushed the penalty phase, in contravention of Scull v. State, 569 So.2d 1251, 1252 (Fla.1990).
Here, the penalty phase began on Monday, December 7, at 9:05 a.m., and the jury retired to deliberate at 8:50 p.m. Woodel's counsel contends that an objection was lodged to the "lateness" of the hour during the charge conference prior to closing statements and commented that the jurors looked tired. The State maintains that there is nothing in the record to indicate jury fatigue, and, in fact, the jury had been in recess for two and a half days prior to the penalty phase. The State further argues that the defense knew and helped select the timing of the penalty phase.
The record reveals that on Wednesday, December 2, the trial court and attorneys discussed the date for the penalty phase. This conversation occurred prior to charging the jury during the guilt phase. At that time, the trial judge announced that he had a judicial conference to attend beginning on Tuesday, December 8. Several alternatives were discussed about timing the penalty phase. The trial court and the defense and prosecuting attorneys all agreed that the penalty phase, if needed, would begin on Monday, December 7. The trial court charged the jury in the guilt phase the morning of December 3, with the jury reaching its verdict the morning of Friday, December 4. The penalty phase began on Monday, December 7.
The record further demonstrates that during the penalty phase, the trial court limited neither the number of witnesses nor the examination of any of the witnesses. The trial court repeatedly stressed that the attorneys should not compromise their case by proceeding too quickly. The trial court made this and other similar comments several times during the penalty phase: "Let's move as fast as we can without jeopardizing either side."
Assuming Woodel's counsel lodged a valid objection, we find that Woodel is not entitled to relief on this issue. A trial court has the inherent authority to control the administrative functioning of its courtroom so long as the trial court does not abuse that authority. See State ex rel. Evans v. Chappel, 308 So.2d 1 (Fla.1975). Here, the trial court was in the best position to view the jurors, attorneys, defendant, and court personnel for fatigue and to protect the defendant's right to a fair trial. Under these circumstances, we do not conclude that the trial court abused its discretion in denying counsel's objection.
Woodel next claims that the trial court erred in finding as aggravators that the murders were committed during a burglary and that the victims were particularly vulnerable due to advanced age or disability. Regarding the burglary aggravator, we have already upheld the armed burglary conviction. Thus, this issue is meritless. Regarding the particularly vulnerable due to advanced age or disability *325 aggravator, Woodel argues that there was no evidence that demonstrates that Woodel selected the Moodys due to their age. Woodel further argues that there should not be a per se age upon which this finding is automatic. Here, according to Woodel, there is no evidence to support the idea that the Moodys were particularly vulnerable due to advanced age or disability.
The Legislature enacted this aggravator during the 1996 session, and it became effective October 1, 1996.[9] Section 921.141(5)(m), Florida Statutes (Supp. 1996), sets forth this aggravating circumstance as: "The victim of the capital felony was particularly vulnerable due to advanced age or disability, or because the defendant stood in a position of familial or custodial authority over the victim."
We have previously upheld this aggravator against facial constitutional attack. See Francis v. State, No. SC94385, slip op. at 58, ___ So.2d ___, ___, 2001 WL 1628780 (Fla. Dec.20, 2001). In Francis, we noted that the finding of this aggravator is a fact-sensitive inquiry requiring more than just a birth certificate. See id. at 58-59, at ___ - ___. In Francis, we rejected the finding of the aggravator on the expressly stated basis in the sentencing order that the victims were sixty-six years old and were in overall good health. See id. We stated: "The statute clearly reads that the person must not only be of `advanced age,' but must instead be `particularly vulnerable due to advanced age.'" Id. at 59, at ___.
In contrast to Francis, here there were findings sufficient to find this aggravator. The sentencing order states:
Mrs. Moody was a 74-year old lady who, though in overall good health for a lady her age, had a prior injury to her shoulder that had diminished her use of one arm. Mr. Moody, however, was a 79-year old man who had in the recent past undergone heart by-pass surgery and suffered the residual problems and effects therefrom. Indeed, while Mrs. Moody fought valiantly, her age and disability without a doubt contributed to her defeat and death at the hands of a healthy man approximately one third her age. Mr. Moody's age and physical condition forced him to yield to the overpowering youth and strength of the defendant. This Court finds this aggravating circumstance has been proven beyond a reasonable doubt.
State v. Woodel, No. CF97-00047A-XX, order at 3-4 (Fla. 10th Cir. Ct. order filed Jan. 26, 1999).
Here, the victims were in their seventies and their attacker was twenty-six. The significant disparity in age between the victims and their attacker is a proper consideration for this aggravator. Contrary to Woodel's assertion, the finding of this aggravator is not dependent on the defendant targeting his or her victim on account of the victim's age or disability.
Competent, substantial evidence exists to support this aggravator for the murders of both Clifford and Bernice. With regard to Clifford, there was evidence that Clifford led a sedentary lifestyle resulting from a triple bypass surgery. He previously had both knees replaced and walked with an uneven gait. With regard to Bernice, Dr. Melamud testified that Bernice had medicine in her system, probably for arthritis. Additionally, Bernice's eldest daughter testified that Bernice previously had broken her arm and completely severed the ball in its socket in her shoulder and was in excruciating pain. This resulted in a loss of mobility, partial loss of *326 use, and loss of strength in her left arm. Notably, Dr. Melamud testified that the defensive wounds Bernice sustained were on her right arm. Thus, the trial court did not err in finding this aggravator for both victims.
Woodel's final argument concerns the mitigation evidence. Woodel argues that the trial court failed to properly consider and weigh the mitigation evidence and that the trial court erred in rejecting Woodel's claim that he was intoxicated at the time of the offense. The trial court's sentencing order regarding mitigation states in its entirety:
B. MITIGATING CIRCUMSTANCES

The State concedes that the defense has established both of the only two statutory mitigators offered:
1) The defendant has no significant history of prior criminal activity.
2) The existence of any other factors in the defendant's background that would mitigate against the imposition of the death penalty.
The first mitigation bears little or no elaboration. Whatever weight assigned to this factor pales to insignificance in the face of the enormity of these murders.
The second "catch-all" mitigation consisted of seven separate considerations:
1. Physical abuse suffered as a child.
2. Neglect by mother as a child.
3. Instability of residences as a child.
4. Being a child of deaf mute parents.
5. Use of alcohol and drugs.
6. Willingness to meet with the daughter of Clifford and Bernice Moody.
7. Willingness to be tested for possible bone marrow donations for his daughter who has leukemia.
Of those considerations the defense pursued primarily the proposition that Woodel was so intoxicated from overindulgence in alcoholic beverages that he was incapable of forming the requisite intent. This circumstance was not proven by a preponderance of evidence. The jury rejected that argument, as does the Court.
The remaining considerations under the "catch-all" mitigating circumstances bear no further elaboration. They have been proven by a preponderance of evidence and the Court has relegated them to relative insignificance and minimal weight.
State v. Woodel, No. CF97-00047A-XX, order at 4-5 (Fla. 10th Cir. Ct. order filed Jan. 26, 1999).
In Campbell v. State, 571 So.2d 415 (Fla.1990), we described the need for trial courts to enter sentencing orders which "expressly evaluate" the proposed mitigation by the defendant and determine whether it truly is mitigating in nature. See id. at 419-20. A sentencing order that comprehensively addresses all mitigation and which weighs the mitigation against the aggravation is absolutely essential to ensure meaningful appellate review in capital cases. See Jackson v. State, 767 So.2d 1156, 1159 (Fla.2000). In Ferrell v. State, 653 So.2d 367, 371 (Fla.1995), we explained in detail:
The sentencing judge must expressly evaluate in his or her written sentencing order each statutory and non-statutory mitigating circumstance proposed by the defendant. This evaluation must determine if the statutory mitigating circumstance is supported by the evidence and if the non-statutory mitigating circumstance is truly of a mitigating nature. A mitigator is supported by evidence if it is mitigating in nature and reasonably established by the greater weight of the evidence. Once established, the mitigator is weighed against any aggravating circumstances. It is within the sentencing judge's discretion to determine *327 the relative weight given to each established mitigator; however, some weight must be given to all established mitigators.[10] The result of this weighing process must be detailed in the written sentencing order and supported by sufficient competent evidence in the record. The absence of any of the enumerated requirements deprives this Court of the opportunity for meaningful review.
The sentencing order at issue here fails to expressly evaluate each mitigating circumstance, fails to determine whether these mitigators are truly mitigating, fails to assign weights to the aggravators and mitigators, fails to undertake a relative weighing process of the aggravators vis-a-vis the mitigators, and fails to provide a detailed explanation of the result of the weighting process. For example, there was extensive evidence presented of difficulties Woodel suffered due to the fact that both of Woodel's parents were deaf and did not speak. Becky Russell, Woodel's aunt, testified that because Woodel's parents could not hear him cry as a baby, it was difficult for his parents to provide a nurturing environment. Dr. Henry Dee testified with regard to the social difficulty generally experienced by children of deaf parents. Albert Woodel, Woodel's father, testified that he had to place Woodel and his sister Bobbi in a children's home from time to time during their developmental years. Bobbi testified that their mother was an alcoholic and that they sometimes had to steal groceries to feed themselves.
Clearly, the trial court's sentencing order here does not examine this or any other aspect of Woodel's mitigation. We again reiterate that the relative weight assigned to a mitigator is within the discretion of the trial court. See Ferrell, 653 So.2d at 371. However, a trial court cannot summarily dispose of mitigation in this fashion.
We are unable at this time to provide meaningful review of the imposition of the death sentence or undertake our proportionality review. See Jackson, 767 So.2d at 1159. Accordingly, we vacate the death sentence and remand to the trial court for it to reconsider the sentence. Should the trial court again determine that the death penalty is the appropriate sentence for either or both murders, the trial court must enter a sentencing order that complies with the dictates of Campbell and the other cases which we have decided in respect to the adequacy of sentencing orders.

CONCLUSION
For the reasons expressed above, we affirm Woodel's convictions, vacate both death sentences, and remand to the trial court with instructions that the trial court enter a new written sentencing order should the trial court again impose one or two death sentences. We direct that the trial court comply with the procedural requirements for the entry of a new sentencing order that we outlined in Jackson v. State, 767 So.2d at 1160-61.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, PARIENTE, LEWIS, and QUINCE, JJ., concur.
ANSTEAD, J., concurs in result only.
NOTES
[1] See § 921.141(5)(b), Fla. Stat. (Supp.1996).
[2] See § 921.141(5)(d), Fla. Stat. (Supp.1996).
[3] See § 921.141(5)(h), Fla. Stat. (Supp.1996).
[4] See § 921.141(5)(m), Fla. Stat. (Supp.1996).
[5] See § 921.141(5)(e), Fla. Stat. (Supp.1996).
[6] See § 921.141(6)(a), Fla. Stat. (Supp.1996).
[7] Woodel argues that: (1) his motions for judgment of acquittal should have been granted by the trial court regarding premeditation, robbery, and burglary; (2) the trial court impermissibly allowed constructive amendment of the indictment; and (3) his mistrial motion should have been granted because the State made an impermissible reference to a marital communication in its opening statement.
[8] Woodel argues that: (1) the trial court committed reversible error for rushing the penalty phase; (2) the trial court erred in finding the burglary and advanced age aggravators; and (3) the trial court erred in evaluating the mitigation evidence.
[9] See ch. 96-302, § 1, at 1355, Laws of Fla.
[10] We have subsequently receded from the requirement that each mitigator, once found, must have some weight. See Trease v. State, 768 So.2d 1050, 1055 (Fla.2000) ("We hereby recede from our opinion in Campbell to the extent it disallows trial courts from according no weight to a mitigating factor and recognize that there are circumstances where a mitigating circumstance may be found to be supported by the record, but given no weight.").