GROSS, J.
 

 Joseph Williams appeals his conviction for the first-degree murder of his estranged wife. At the jury trial, Williams’ defense was that he acted in the heat of the moment, so the killing was not premeditated. On appeal he argues that the state did not establish premeditation and that the trial court abused its discretion in admitting two photographs of his wife’s body. Because the evidence presented a jury question on premeditation, and the photographs were relevant and not unduly prejudicial, we affirm.
 

 I. FACTS
 

 Williams and his wife were married in late November 2006. They had a three-
 
 *728
 
 year-old son. Williams and his wife began experiencing problems soon after the marriage. In December 2006, Williams told a former girlfriend with whom he had recently reestablished contact that “if she [the wife] continued the physical abuse he would retaliate and kill her or something like that.” The former girlfriend did not remember the exact words Williams used, but was otherwise certain of the content of the statement.
 

 The bulk of the state’s evidence detailed Williams’ movements on Saturday, January 20, 2007, the day the wife died, and the weeks thereafter. Relevant here is that Williams was with the wife and their son early that Saturday morning. At that time, Williams called the police to request that an officer stand by as he went home to collect some belongings. Williams called the same officer a couple of hours later, reporting he was being kicked out of the home. The officer responded, but he determined there was no violence and left.
 

 At around noon, while driving in a white van on the highway with his son and wife, Williams ran out of gas. A friend met up with Williams to bring gas and, while Williams filled the tank, his wife and son remained in the vehicle. With a full tank, the three then headed over to an area where some of Williams’ friends lived. Williams, along with his wife and son, went back and forth between the houses of two of Williams’ friends for a while. Eventually, Williams returned to one friend’s house with his son, but without his wife. Williams, who was in a sweaty T-shirt and chain-smoking, then left in the white van, leaving his son at the friend’s house.
 

 Williams asked the friend to drop his son off at the house of the wife’s mother. The mother had received a phone call from her daughter at around noon that day. The wife had reported that she was with Williams and their son at a park. Although the wife had said she would be leaving Williams and the son to come to her mother’s house, the wife never arrived. The mother later received two calls from her daughter’s cell phone; both times it was Williams. Williams said, “I need you to watch [my son] for me for a couple of hours.” The mother asked, “Where’s [the wife]?” Williams answered, “She’s gone.” The mother persisted, “Gone, where?” Williams said, “I don’t know, she’s gone.”
 

 The mother became concerned about the wife and began calling her daughter’s cell phone. No one picked up. The mother called the wife’s friends; none had seen or heard from her. The mother made further efforts to track the wife down, to no avail. She called the police on Sunday, the 21st, and filed a missing person’s report. She told the assigned officer that the last person she knew her daughter to be with was Williams. According to other witnesses, Williams remained in Broward County until around January 23.
 

 On February 5, a construction manager found the wife’s body at a work site and called the police. The Broward County Sheriffs Office responded to the scene and removed the body from the wooded area. The body was wrapped inside a cloth mattress cover, with a zipper on one end. One foot was sticking out of the cover, and it appeared an animal had gnawed on the foot. The detectives unzipped the cover and exposed the body. From the neck up, the body “was almost completely skeleton-ized” due to decomposition. They were able to identify the body because the wife’s purse was inside the cover. Williams and the state stipulated that this body was the wife’s.
 

 Williams was apprehended in Tallahassee. Although he was arrested for outstanding traffic warrants, officers from Broward told Williams that they wanted to talk to him about his missing wife. They
 
 *729
 
 transported him to the Leon County Sheriffs office. After they read him his rights, Williams agreed to speak with the officers. Seeing that he was visibly upset, the officers went into the interrogation room to ask if he was okay.
 

 Immediately, Williams told the officers, “I killed [my wife].” They asked Williams how he killed her. Williams responded, “I stabbed her in the neck” with a kitchen knife. When asked where, he said: “In the van, in the white van.” The officers asked: “Joe, why, why did you do this?” Williams replied, “I lost it, I prayed before I did it, but I lost it.” He continued, “I drove around with her body all day in the van. I took her, wrapped her up in a cover and I threw her next to some dumpsters over a fence.” At the time of the interrogation, Williams had several cuts on his hands. When the officers asked him about the cuts, Williams explained that he received them from the knife he used to stab his wife. The white van was later found, and there were blood stains throughout. According to a stipulation, a blood test revealed that the blood found in the van was the wife’s.
 

 Dr. Joshua Perper, Broward County’s chief medical examiner, saw the wife’s body where it was found and observed the autopsy of her decomposed body the next day. Because maggots usually attack stab wounds, Dr. Perper concluded that the fact that the wife’s neck was infested with a concentration of maggots revealed that there had been a neck injury. Indeed, the autopsy revealed trauma to the side of the neck, likely resulting from a stab wound.
 

 The prosecutor showed Dr. Perper two photographs of the decomposing body, state’s exhibits 33 and 34. Both of the photographs were taken where the body was found, but after law enforcement had removed the body from the wooded area. The first photograph, 33, showed the wife’s back and buttocks. A tattoo of the name “Joe” was in the middle of the back just above the waistline. Maggots were scattered on portions of the body. The second photograph, 34, showed almost the entire front of the naked body. It is a gruesome photograph. Parts of the body are badly decomposed and infested with maggots, and most of the flesh from the neck up is gone, showing the skull. Dr. Perper testified that the photographs would assist him in .describing the decomposition for the jury.
 

 The prosecutor moved the photographs into evidence. Williams objected, arguing that they were extremely graphic, and that the photograph of the tattoo was superfluous because he had already stipulated to identity. The trial court overruled the objection, finding that the photographs would aid Dr. Perper in describing what the body looked like and what he did. The court also noted that the state was entitled to prove the manner and cause of death.
 

 Dr. Perper used exhibit 33 to describe the decomposition of the wife’s body. He used exhibit 34 to further describe the decomposition and, also, to explain that environmental factors caused the head area to experience more decomposition than the rest of the body. Additionally, Dr. Perper pointed to the neck area of the body and noted, “there was an area which looked like a defect which, in my opinion, was caused more slightly by a stab wound and this was confirmed later on and there were maggots which enlarged this area as maggots do, if there’s a bleeding injury the fly will stay there.” Dr. Perper could not say with certainty how many times the wife had been stabbed, only that she had been stabbed one or more times.
 

 After the state rested, and in lieu of a motion for judgment of acquittal, Williams moved the trial court to reduce the first-degree murder charge to second-degree
 
 *730
 
 murder or manslaughter. He argued that the state failed to introduce any evidence of premeditation. In response, the prosecutor asserted that the law does not require a certain amount of time to pass between the formation of intent and the killing, and that Williams’ statement that he prayed before killing the wife suggested a sufficient amount of time had passed. The court agreed and further observed that if Williams had time to pray, he had enough time for reflection. Concluding that intent is a question of fact, the court denied Williams’ motion.
 

 The jury found Williams guilty of first-degree murder. The trial court sentenced Williams to life in prison without parole. It denied Williams’ motion for a new trial on the two points he raises on appeal.
 

 II. ANALYSIS
 

 A.
 
 Evidence of Premeditation
 

 Williams first argues that the state failed to establish premeditation, so the evidence against him was insufficient to prove first-degree murder. He contends his statement to the former girlfriend could not be construed as a threat, and his confession that he prayed before stabbing the -wife was countered by the second part of the confession that he “lost it.” We reject this argument. The confession and threat together established direct evidence of premeditation, which was further buttressed by circumstantial evidence.
 

 A “motion to reduce charge” is governed by the same standards that govern a motion for judgment of acquittal, as both challenge the sufficiency of the evidence.
 
 See Pellot v. State,
 
 582 So.2d 124, 125-26 (Fla. 4th DCA 1991). Thus, on appeal, we review the trial court’s denial
 
 de novo
 
 and we will affirm if the conviction is supported by competent, substantial evidence.
 
 Floyd v. State,
 
 913 So.2d 564, 571 (Fla.2005);
 
 Pagan v. State,
 
 830 So.2d 792, 803 (Fla.2002). When a defendant moves for a judgment of acquittal or, as here, for a conviction on a lesser charge, he admits all the facts in evidence, and the trial court must draw all reasonable inferences in the state’s favor.
 
 Floyd,
 
 913 So.2d at 571. “If ... a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain the conviction.”
 
 Pagan,
 
 830 So.2d at 803 (citation omitted).
 

 The element at issue here is premeditation. “Premeditation is the essential element which distinguishes first-degree murder from second-degree murder.”
 
 Coolen v. State,
 
 696 So.2d 738, 741 (Fla.1997) (citing
 
 Wilson v. State,
 
 493 So.2d 1019 (Fla.1986));
 
 see also
 
 § 782.04(1), Fla. Stat. (2007). “Premeditation is a fully formed conscious purpose to kill that may be formed in a moment and need only exist for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act.”
 
 Asay v. State,
 
 580 So.2d 610, 612 (Fla.1991) (citations omitted). Put differently, the defendant needs only enough time to allow him to reflect on the nature of the act.
 
 Perry v. State,
 
 801 So.2d 78, 84 (Fla.2001).
 

 Williams contends that this case involves only circumstantial, indirect evidence. That is usually true of cases turning on premeditation — a matter involving the internal processes of the defendant’s mind. In such a situation, the state’s evidence must satisfy a special, more stringent standard. This case, however, involves direct evidence, as “[a] confession is direct, not circumstantial evidence.”
 
 Woodel v. State,
 
 804 So.2d 316, 321 (Fla.2001). Accordingly, the normal standard articulated above applies.
 

 In
 
 Woodel,
 
 the supreme court held that the defendant’s confession — “I was hoping
 
 *731
 
 to hit [the victim] on her head to make her pass out, and then I was going to leave. I thought that’s what would happen if you got hit in the head, you know” — was direct evidence of premeditation because it “indicated that he had reflected on his actions prior to killing [the victim].”
 
 Id.
 
 at 321. Similarly, here, Williams admitted he had prayed before killing his wife, which indicates he had a fully formed conscious purpose to kill her, and enough time to reflect on the nature of the act. Williams attempts to minimize the prayer by combining it with the statement that he “lost it,” and concluding that the prayer could have been a desperate attempt to remain in control. However, a rational trier of fact could still determine that the prayer does not eliminate the evidence of premediation.
 

 The statement that Williams made to his former girlfriend one month before the murder provided further direct evidence of premeditation. In
 
 LaMarca v. State,
 
 785 So.2d 1209 (Fla.2001), the supreme court confronted a defendant’s similar statement. There, the defendant had told a witness five months before the murder that he was going to kill the victim.
 
 See id.
 
 at 1211, 1215. When that witness asked the defendant why, the defendant responded, “I’m gonna kill him.”
 
 Id.
 
 at 1211. The court concluded that the statement was direct, competent, and substantial evidence that the defendant had a “ ‘fully formed conscious purpose to kill.’ ”
 
 Id.
 
 at 1215 (quoting
 
 Norton v. State,
 
 709 So.2d 87, 92 (Fla.1997)). Like he did with his confession, Williams tries to minimize his December statement by arguing that it was too conditional to be taken seriously. That, however, is a matter of the weight and not sufficiency of the evidence and, therefore, beyond the purview of a motion for judgment of acquittal or a motion to reduce charge.
 

 In addition to those two pieces of direct evidence of premeditation, there is some circumstantial evidence. “Multiple stab wounds deliberately aimed at vital organs support a finding of premeditation for first-degree murder.”
 
 Davis v. State,
 
 26 So.3d 519, 530 (Fla.2009) (citation omitted). Here, Williams stabbed his wife in the neck. Although Dr. Perper could not determine how many times the wife had been stabbed, the multiple cuts on Williams’ hands — received from the knife he used to stab her — permits the inference he made several stabbing motions at her.
 

 There was sufficient direct and circumstantial evidence of Williams’ premeditation to create a jury question. Accordingly, we hold that the trial court did not err in denying Williams’ motion to reduce the charge from first-degree to second-degree murder.
 

 B.
 
 Photographs of the Victim’s Body
 

 In his second issue, Williams argues that the trial court abused its discretion when it admitted into evidence the photographs of his wife’s body. He argues that they had no relevance because the body was too decomposed to show the cause of death and, with reference to the photograph showing the “Joe” tattoo, because the parties had stipulated to the victim’s identity. Alternatively, Williams argues that if they were relevant the photographs were so gruesome and inflammatory that their prejudice substantially outweighed their probative value. We disagree, because the photographs were relevant and not unduly prejudicial.
 

 We review the trial court’s admission of the photographs for an abuse of discretion.
 
 Doorbal v. State,
 
 983 So.2d 464, 497 (Fla.2008). The Florida Supreme Court articulated the relevant analysis in
 
 Douglas v. State:
 

 The test for admissibility of photographic evidence is relevancy rather
 
 *732
 
 than necessity. Crime scene photographs are considered relevant when they establish the manner in which the murder was committed, show the position and location of the victim when he or she is found by police, or assist crime scene technicians in explaining the condition of the crime scene when police arrived. This Court has upheld the admission of autopsy photographs when they are necessary to explain a medical examiner’s testimony, the manner of death, or the location of the wounds.
 

 However, even where photographs are relevant, the trial court must still determine whether the “gruesomeness of the portrayal is so inflammatory as to create an undue prejudice in the minds of the jurfors] and [distract] them from a fair and unimpassioned consideration of the evidence.” In making this determination, the trial court should “scrutinize such evidence carefully for prejudicial effect, particularly when less graphic photos are available to illustrate the same point.” As we explained in
 
 Almeida v. State,
 
 748 So.2d 922, 929 (Fla. 1999), the relevancy standard “by no means constitutes a carte blanche for the admission of gruesome photos.”
 

 878 So.2d 1246,1255 (Fla.2004) (alterations in original) (all citations but one omitted).
 

 Exhibits 38 and 34 were relevant for the same reasons the photograph in
 
 Douglas
 
 was relevant. In
 
 Douglas,
 
 the trial court admitted a photograph of the victim’s body “as she was found at the crime scene.”
 
 Id.
 
 The supreme court found that the photograph was relevant because it showed how the “body appeared at the time the police and [the associate medical examiner] arrived on the scene.”
 
 Id.
 
 at 1255-56. Additionally, the medical examiner “referred to this photograph when explaining his initial impressions and assessment of the injuries sustained by [the victim].”
 
 Id.
 
 at 1256.
 

 Here too the photographs depicted the wife’s body at the scene of its discovery. The photographs aided Dr. Perper in describing the condition of the body when it was found and his initial impressions of the wife’s injuries, despite the decomposition. These impressions led Dr. Perper to conclude that the wife likely died of a stab wound to the neck — the manner of her death — contrary to Williams’ argument that the body was too decomposed to reveal the cause.
 

 Exhibit 33, the photograph depicting the tattoo, was relevant for the additional reason that it went toward establishing the identity of the body. Contrary to Williams’ argument, it is not significant that the parties had stipulated to the identity of the victim, or that he did not dispute the manner of death. As we stated in
 
 Gryczan v. State,
 
 726 So.2d 345, 347 (Fla. 4th DCA 1999), “regardless of the stipulation [of identity and cause of death], the state is not relieved of the burden of proving the elements of defendant’s guilt.”
 
 See also Foster v. State,
 
 369 So.2d 928, 930 (Fla.1979) (“A defendant cannot, by stipulation as to the identity of a victim and the cause of death, relieve the state of its burden of proof beyond a reasonable doubt.”).
 

 Although the photographs were relevant, we must next determine whether their probative value was substantially outweighed by their prejudicial effect.
 
 See
 
 § 90.403, Fla. Stat. (2007). The photographs showed advanced decomposition, including maggot infestation. But, “[t]he mere fact that [the] photographs may be gruesome does not necessarily mean they are inadmissible.”
 
 Harris v. State,
 
 843 So.2d 856, 864 (Fla.2003). The photographs must be so gruesome and inflammatory that they create an undue preju
 
 *733
 
 dice in the minds of the jurors and distract them from a fair and unimpassioned consideration of the evidence. We cannot say that the photographs, while gruesome, were
 
 so
 
 grisly that they prevented the jury from rationally analyzing the state’s evidence.
 

 Williams relies on
 
 Czubak v. State,
 
 570 So.2d 925 (Fla.1990), but that case is distinguishable. In
 
 Czubak,
 
 the defendant challenged the admission of “several particularly gruesome photographs of the victim’s body.”
 
 Id.
 
 at 928. The photographs showed a victim who had been dead “at least a week” and was “severely decomposed and discolored.”
 
 Id.
 
 They also showed that “portions of [the victim’s] left arm and leg were missing, apparently eaten away by two small dogs,” as well as a “leg bone exposed where the flesh had been eaten away.”
 
 Id.
 
 The supreme court determined initially that the photographs “had little or no relevance.”
 
 Id.
 
 at 929. What little relevance they may have had was greatly undermined by the fact the damage was caused “by factors apart from the crime itself’: “the length of time she had been dead and the ravages of the dogs.”
 
 Id.
 
 “Under these circumstances,” the court wrote, “where the probative value of the photographs was at best extremely limited and where the gruesome nature of the photographs was due to circumstances above and beyond the killing, the relevance of the photographs is outweighed by their shocking and inflammatory nature.”
 
 Id.
 

 Williams contends the photographs were unduly prejudicial because the condition of the body was the result of the environment, maggots, and animal depredation— circumstances not attributable to him. To the contrary, the severe decomposition around the wife’s neck was arguably the result of the crime: as Dr. Perper testified, maggots attack stab wounds first. Section 90.403 required the trial court to balance the photographs’ relevance against their prejudicial nature. In
 
 Czubak,
 
 the limited relevance on one scale meant that the gruesomeness of the photographs on the other scale tipped the balance in favor of exclusion. That is not the case here. The gruesome nature of the photographs, attributable to Williams, did not outweigh their relevance to Dr. Perper’s descriptions of the scene, his initial impressions, and the cause of death, and in establishing identity.
 

 We hold that the trial court did not abuse its discretion in admitting exhibits 33 and 34.
 

 Affirmed.
 

 POLEN and DAMOORGIAN, JJ., concur.