PARIENTE, J.,
dissenting.
After conducting a lengthy evidentiary hearing and analyzing all of the evidence presented at the hearing in a comprehensive eighty-six-page order, the trial court concluded that a new penalty phase is required because confidence in the sentence of death has been undermined based on trial counsel’s troubling failure to properly prepare for the penalty phase and present important available mitigation, even after he was given a second chance when a new penalty phase was previously ordered. I dissent from the Court’s rare step of reversing the trial court’s- determination that its confidence in the death sentence was undermined.
This Court’s reversal of the trial court’s exceptional grant of postconviction relief is even more troubling in light of the fact that, even with the minimal mitigation evidence presented to the jury at Woodel’s resentencing, the jury recommended a life sentence as to one of the murders and recommended a death sentence for the other murder by the slimmest margin possible — a seven-to-five vote. For the reasons addressed below, after a full assessment of all of the evidence presented at the resentencing, in addition to the newly discovered mitigation evidence presented during postconviction proceedings, in my view, competent, substantial evidence supports the trial court’s factual findings that formed the basis for granting a new penalty phase and the trial court did not err when in undertook its legal analysis.
Like the trial court, I conclude that the failure of trial counsel to pursue additional mitigation and perform any additional meaningful investigation prior to Woodel’s resentencing undermines confidence in the outcome of the death sentence, which was recommended by a bare majority of the jury. A proper analysis of Woodel’s ineffective assistance of counsel claim under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), demonstrates that Woodel is entitled to a new penalty phase.
In this case, not only does the majority fail to address deficiency at all, but the majority never conducts a full analysis of the Strickland prejudice prong. Specifically, the majority engages in a flawed *812 legal analysis never adopted by this Court, addressing each individual failure to present mitigation evidence in a vacuum and never analyzing whether counsel’s deficiency as a whole operated to undermine confidence in the outcome of the penalty phase. Succinctly stated, when analyzing Strickland prejudice, if the Court finds that counsel was deficient in numerous aspects of his or her performance, the Court cannot simply analyze the prejudice caused by counsel’s failure to present each individual piece of evidence alone. Instead, the Court must review whether counsel’s deficient performance itself prejudiced the defendant. The majority’s piecemeal approach is contrary to the United States Supreme Court’s holding in Strickland, as well as this Court’s precedent, in which the Court considers the Strickland prejudice prong cumulatively. See, e.g., Simmons v. State, 105 So.3d 475, 503 (Fla.2012) (reviewing the claim that counsel failed to properly investigate and failed to present certain mitigation witnesses as a singular claim and reviewing the prejudice from this deficiency on the whole); Robinson v. State, 95 So.3d 171, 177 (Fla.2012) (same); Franqui v. State, 59 So.3d 82, 98 (Fla.2011) (reviewing Strickland claims individually and cumulatively after determining that counsel may have been deficient in failing to object to multiple prosecutorial comments).
While the majority undertakes a separate cumulative error analysis after erroneously concluding that Woodel’s Strickland claim lacks merit, cumulative error is a separate and distinct analysis from analyzing prejudice under Strickland. See, e.g., Brown v. State, 846 So.2d 1114, 1126 (Fla.2003) (analyzing cumulative error separately and holding that a cumulative error claim fails when the defendant fails to establish any of his claims under Strickland). Thus, the cumulative error analysis cannot be substituted for a Strickland prejudice analysis, without conflating a cumulative error analysis with a Strickland prejudice analysis.[16]
For those reasons, I view this case as very similar to the United States Supreme Court’s reversal in Sears v. Upton, 561 U.S. 945, 130 S.Ct. 3259, 177 L.Ed.2d 1025 (2010), where the Supreme Court held that the state supreme court applied the wrong prejudice analysis when it denied the defendant relief on the basis of counsel’s constitutionally inadequate initial mitigation investigation. After emphasizing counsel’s inadequate mitigation investigation, the Supreme Court stressed that it had never limited its prejudice inquiry under Strickland to cases in which there was “only little or no mitigation evidence presented.” Id. at 3266 (citations omitted). The Supreme Court then stressed that it “categorically rejected the type of truncated prejudice inquiry undertaken by the state court” below and emphasized its holding in Porter v. McCollum, 558 U.S. 30, 33, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009), in which the Court recently explained:
“To assess [the] probability [of a different outcome under Strickland], we consider the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding — and reweigfh] it against the evidence in aggravation.” 558 U.S., at 41 [130 S.Ct. 447] (internal quotation marks omitted; third alteration in original).
That same standard applies — and will necessarily require a court to “specu *813 late” as to the effect of the new evidence — regardless of how much or how little mitigation evidence was presented during the initial penalty phase. Indeed, it is exactly this kind of probing inquiry that Justice SCALIA now undertakes, post, at 8268-3271, and that the trial court failed to do. In all circumstances, this is the proper prejudice standard for evaluating a claim of ineffective representation in the context of a penalty phase mitigation investigation.
Sears, 180 S.Ct. at 3266-67 (emphasis added) (quoting Porter, 558 U.S. at 41, 130 S.Ct. 447).
Moreover, this flawed analysis in this case may have led the majority to improperly conclude that the prejudice prong of Strickland was not met by looking at the deficiencies and prejudice arising from the individual failures piecemeal rather than as a whole. This type of piecemeal analysis is particularly problematic because the majority addresses only prejudice and never focuses on the numerous deficiencies in trial counsel’s failure to follow-up on mitigation before the second trial after requesting a continuance of the original trial to pursue that very mitigation.
Even though defense counsel did present some witnesses who testified during the resentencing as to the abuse that Woo-del suffered during his life, one of the primary witnesses counsel relied upon was the abuser himself who attempted to mitigate his own actions. The other witness was Woodel’s aunt, who did not have much contact with Woodel.
By contrast, the quality of the witnesses presented at the postconviction evidentiary hearing provided a more complete picture of not only the abuse, but the impact of being a child of deaf parents. Postconviction counsel found numerous witnesses who were willing to testify, all of whom were available to trial counsel if he had just performed a proper investigation. These witnesses included Woodel’s half-brother, who also grew up in the same abusive environment and suffered significant addiction problems as an adult; Woo-del’s uncle, who discussed the inter-generational abuse within the family; witnesses who knew Woodel when they lived at the Children’s Home and saw Woodel’s desperate attempts to fit into the hearing world; people who interacted with Woo-del’s parents and interacted with Woodel when he was a child and who could have testified as to the situation that Woodel faced growing up; a mental health counselor who saw Woodel when he was young and thought his parents were unfit to raise children; neighbors and acquaintances who knew Woodel’s parents and expressed concern because, based on their limited interactions, they understood that Woo-del’s parents were unfit to raise children; a psychiatrist who works with the deaf and hard of hearing, as well as with children of deaf adults (CODAs); an expert as to clinical pharmacology, who discussed the effect of alcohol on Woodel at the time of the crime; and a psychologist who testified as to the significant limitations that Dr. Dee had in attempting to provide his diagnosis during the trial and the second penalty phase based on Dr. Dee’s lack of sufficient information.
As addressed in more detail below, I first review the deficiency of Woodel’s trial counsel in completely failing to ensure that a full mitigation investigation was undertaken in this case, even though counsel had two attempts in which to act, and second, I review the clear prejudice that this deficiency had on the case.
DEFICIENCY
While this Court can properly deny relief if either deficiency or prejudice is lacking, the majority’s failure to address *814 counsel’s numerous glaring deficiencies, in addition to its piecemeal approach to each subclaim of prejudice, provides an incomplete picture of why a new penalty phase is required. The deficient performance is even more egregious because counsel had a second chance to pursue important investigative leads between the initial and second penalty phases and completely failed to do anything additional during this significant timeframe.
As the trial court pointed out, although the prejudice analysis must focus on the 2004 trial, the deficiency must be seen as starting during the 1998 proceeding. The evidentiary record establishes trial counsel’s complete failure to investigate necessary mitigation prior to the start of the first trial, including crucial social history and Woodel’s background. Instead, counsel relied solely upon hiring a mental health expert, Dr. Dee, who had not been provided with the necessary background information. Dr. Dee himself requested counsel to hire a person who could help him find witnesses to interview as a part of his evaluation.
But it was not until three days after jury selection began during the initial trial that Toni Maloney was appointed to assist in the case as a witness coordinator. However, Maloney was not hired to “perform a thorough mitigation investigation”; she was hired to help put the records together and contact witnesses so that Dr. Dee could interview them as a part of his evaluation. In locating witnesses for Dr. Dee, Maloney interviewed Woodel at the jail and noticed that Woodel would communicate by attempting to sign and talk at the same time. During the interview, Malo-ney discovered that both of Woodel’s parents were deaf and informed both counsel and Dr. Dee about this critical development. Because Maloney was attempting to find necessary information for Dr. Dee after the trial had already commenced, and because she was retained during the same time period as the Thanksgiving holiday, Maloney had a difficult time obtaining all of the information and records that she needed in time for the defense’s use at trial. Counsel requested a continuance to pursue additional mitigation, but this request was denied.
One of Woodel’s trial attorneys admitted during the postconviction evidentiary hearing that he did not realize that both of Woodel’s parents were deaf until the trial had commenced. Defense counsel did not recall interviewing Woodel’s father until after the trial began and never found Woo-del’s mother, although counsel also did not hire an investigator. At the initial penalty phase, counsel called Dr. Dee, a few people who knew Woodel at the time of the crime, and three of Woodel’s family members: Woodel’s father, sister, and aunt. However, at trial, Woodel’s father testified in an inconsistent manner from his prior statements to Dr. Dee, and because a proper background investigation was never conducted, the defense did not have adequate information to respond.
After the initial penalty phase, the jury recommended a sentence of death for both murders, which the trial court imposed. However, because the trial court failed to provide an adequate sentencing order, this Court reversed for a new penalty phase. Woodel v. State, 804 So.2d 316, 327 (Fla.2001). Probably most tellingly as to the degree of deficient performance during the resentencing, although trial counsel was aware of the significant amount of mitigation investigation that was necessary, after a new penalty phase was required, counsel failed to follow up at all — even though counsel had previously recognized in 1998 that additional time to discover mitigation was essential and for that reason had requested a continuance.
*815 Specifically, counsel failed to request that Maloney, or any other individual, finish the investigation that began in 1998. Instead, trial counsel simply proceeded with the same information gleaned from the original trial. As the trial court stated:
In preparation for the second penalty phase, Mr. Colon talked to three family members, Bobbie Hermes, Albert Woo-del and Margaret Russell. The same three people that testified at the 1998 trial. He did not go to North Carolina or Michigan and he did not hire an investigator to do so. All he did was review records and proceed with the same type of defense. He did not hire Toni Maloney, or for that matter, any mitigation specialist to talk to family members and other potential witnesses. He acknowledged on redirect that it may have been a bad decision. He did no additional investigation or try to find a CODA expert. Mr. Colon said “looking back, I wish I had hired somebody that would have come in and provided further testimony.” Mr. Colon was on notice that he had unique issues regarding his client.
While this Court does not engage in 20/20 hindsight or second-guess strategic decisions, to reach the conclusion that trial counsel was seriously deficient, the Court needs only to look at what trial counsel himself told the trial court in 1998 as to the further necessary investigation, when counsel requested a continuance in order to pursue the additional mitigation sought by Dr. Dee and Maloney. Moreover, the failure to properly investigate can never be considered a strategic decision. See Wiggins v. Smith, 539 U.S. 510, 522, 128 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (explaining that “counsel’s failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision ... because counsel had not ‘fulfilled] their obligation to conduct a thorough investigation of the defendant’s background’ ” (quoting Williams v. Taylor, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (alteration in original))). In fact, as recognized by the United States Supreme Court, when counsel “eonduct[s] a constitutionally deficient mitigation investigation ..., at the very least, [this] call[s] into question the reasonableness of [counsel’s] theory.” Sears, 130 S.Ct. at 3265.
Maloney testified at the evidentiary hearing, detailing the considerable additional investigation that she normally would have conducted had she not been constrained by the significant time limitations during the original trial. Maloney, who served as a mitigation specialist in a number of prior cases, was familiar with the substantial amount of work required to investigate and prepare for a penalty phase, stating that she usually had almost a year to investigate a capital defendant’s background and history when she was hired as a mitigation investigator. In this case, she was hired as support during the few weeks while the trial progressed. She testified that when she learned that both of Woodel’s parents were deaf, she was “frantic ... to try to understand that particular issue and the dynamics of it” but had very little time. She found a book on the matter, which she gave to Dr. Dee. If she had been appointed to perform a mitigation investigation with sufficient time, however, she testified that she would have contacted Thomas Kerwin, a mental health expert that Woodel saw as a child; contacted people who worked at the Children’s Home where Woodel lived for years as a child; visited the areas where Woodel grew up; and contacted people in the deaf community.
In addition, attorney Robert Norgard testified as an expert on prevailing profes *816 sional norms among capital defense attorneys. While he was troubled by many things that occurred in this case, Norgard was particularly bothered by the fact that Woodel’s trial counsel did not realize that Woodel’s parents were both deaf until well into the guilt phase of the trial, as this would have been apparent if counsel had interviewed the parents prior to trial. As he testified, “[That is] the part that just really boggles my mind about the whole situation is that a basic penalty phase investigation would start with the parents. And the first contact with the parents you would have known they were deaf, whether your client told you or not, so. I mean, that’s the part that, you know, surprises me about the late discovery of it.” The trial court detailed the numerous problems that Norgard discussed, including the amount of research defense counsel failed to undertake before determining whether to present expert testimony concerning a voluntary intoxication defense, evidence concerning addiction and its genetic components in this case, and the complete lack of additional preparation when a new penalty phase was ordered.
Trial counsel himself recognized that although he was responsible for investigating all possible mitigation, he never spoke with numerous members of Woodel’s family, including Woodel’s mother, half-brother, or childhood friends. In addition, trial counsel recognized that he did not retain a mitigation investigator to help prepare for the second penalty phase or perform additional investigation, even though counsel had previously recognized that additional time and investigation were necessary. Trial counsel explained his decision not to investigate all available mitigation as follows: “I didn’t feel that it was necessary based on the package I was presenting. And, as I said before, looking back now, that may have been a very bad idea.”
The trial court detailed the numerous deficiencies, and based on the record in this case, there can be no question of counsel’s deficient performance. The inquiry then turns to whether prejudice has been demonstrated such that our confidence in the sentence of death has been undermined, as the trial court found.
PREJUDICE
Numerous witnesses testified at the postconviction evidentiary hearing in great detail as to the abuse that Woodel suffered and the additional mitigation available. While there was discussion of abuse in the second penalty phase proceeding, the quality of the witnesses who were called at the postconviction evidentiary hearing provided a more complete picture of not only the abuse, but the impact of being a child of deaf parents. Although Woodel’s tidal counsel simply chose not to fully investigate the available mitigation because he was content with the witnesses that he found, failing to investigate and failing to present the lay testimony at issue can never be considered a strategic decision of counsel. Moreover, while trial counsel did not believe that it was necessary to introduce a toxicologist to assist in explaining voluntary intoxication, in describing why he did not investigate whether an expert on the deaf culture would have been helpful, trial counsel again dismissed the need to seek out such information because he “felt comfortable with the package” he was presenting to the jury.
Thus, the issue before this Court does not involve a scenario where counsel failed to present certain evidence because it would open the door to the admission of unfavorable evidence or evidence that would damage a defense. Instead, counsel made an unreasonable decision to not conduct any additional investigation that would have uncovered other important *817 mitigation witnesses who could have been very helpful to the defense.
During postconviction proceedings, Woo-del presented the testimony of Dr. Alan Marcus, a clinical psychologist who works with the deaf and with children of deaf parents and who is also a child of deaf parents. Dr. Marcus noted the limitations of the testimony presented by Dr. Dee at the resentencing since Dr. Dee had no prior experience working with children of deaf parents and his sole preparation for testifying in the case was to review the book Mother/Father Deaf, which is a scholarly, anthropological study, as opposed to a psychological review. Dr. Marcus’s testimony, if it had been presented, would have provided the jury a completely different picture of how the crime occurred and substantially increased the mitigation available to the finder of fact — in particular as to four critical aspects.
First, and perhaps most importantly, because Dr. Marcus was familiar with the deaf community and culture, he was able to provide a possible explanation as to how this baffling crime transpired — testifying that the murder may have occurred after an escalation stemming from an initial misunderstanding that was based on the fact that Woodel still acted like a member of the deaf community. Specifically, Dr. Marcus thoroughly explained the importance of socialization for those in the deaf community and how it was common in the deaf community for people to leave their front doors unlocked so they would not miss the arrival of visitors. Likewise, it was not contrary to societal norms for members of the deaf community to walk into each other’s homes, unannounced.
Here, the murder happened after a very intoxicated Woodel walked into the victims’ home to inquire as to the time. Woodel saw that Bernice Moody was awake when she was cleaning, and he knocked on the door. When she did not answer, Woodel thought she could not hear his knock and walked in. Woodel’s statements describing how he first approached the victim were difficult to follow as he contradicted himself, giving three different accounts as to where he was located when Bernice first saw him: he was at the door that went into her bedroom, he was not inside yet, and he was on the porch. When he was questioned further as to where he was when Bernice first saw him, he stated that he could not remember and was unsure. He testified that when Bernice saw him, she took a few steps away, picked up a knife, and swung it at him as she yelled. Woodel attempted to explain why he was there, as she yelled and swung the knife. On the third swing, Woodel pushed her backwards and somehow acquired the knife, although he could not recall how. According to his statement, Woodel thought at the time that she was trying to cut him. Taking Dr. Marcus’s insight together with Woo-del’s intoxication and his upbringing where it was permissible to walk into each other’s homes, the defense could have argued that Woodel did not realize his error in entering her house and thought the victim was threatening him.
Second, and important to the quality of the mitigation presented, because Dr. Dee was unfamiliar with the deaf community, he utilized the incorrect psychological testing, thus presenting misleading evidence to the jury that psychological testing indicated that Woodel was psychotic. Before addressing the testing itself, Dr. Marcus explained how English is a second language to a child of deaf parents, with sign language being his or her primary language. Further, Dr. Marcus noted that even Dr. Dee recognized Woodel’s difficulties in being able to fully express himself orally in English. Dr. Marcus explained critical differences between the English oral lan *818 guage and American Sign Language, stressing that a person cannot simply translate the English language into American Sign Language because American Sign Language is visually driven, while the English language is sound driven.
As to the administration of psychological testing, including the Minnesota Multipha-sic Inventory (MMPI), Dr. Marcus testified that it is widely recognized that the MMPI is inappropriate for deaf people or children of deaf parents because there are too many concepts and terminologies that are misunderstood in the translation, which skews the results. However, the test had never truly been translated into American Sign Language because of the difficulty in translating some of the questions and concepts that are sound based. Based on these problems and the skewed results, as Dr. Marcus directly stated, “They come out looking crazy in simple terms.” However, Dr. Dee administered this test to Woodel, testifying to the jury that when he administered the MMPI to Woodel, the test results indicated that Woodel was psychotic. Although Dr. Dee questioned this result, he did not realize that the MMPI was inappropriate, and merely expressed his concerns that the results of the MMPI must have been flawed for some reason, but was unable to provide an explanation for this result to the jury.
Third, Dr. Marcus interviewed Woodel in sign language, which was incredibly important in light of the apparent difficulties that Woodel had in fully expressing himself verbally. Although Dr. Dee recognized that Woodel was not fully stating his thoughts and opinions verbally as he used both sign language and oral responses, Dr. Dee attempted to remedy this problem by asking Woodel what he was signing. Yet, Dr. Dee also recognized that Woodel’s interpretation of words and his use of language were so odd that as to certain discussions, Dr. Dee “couldn’t make any sense out of what [Woodel] was trying to tell me.” However, neither Dr. Dee nor Woodel’s counsel ever obtained an interpreter to assist in the communication problems. In interviewing Woodel in sign language, Dr. Marcus was able to provide significantly more details about the impact of Woodel’s upbringing on his life and how the abandonment from his parents and the exclusion from the deaf community affected him. In addition, because Dr. Marcus was a child of deaf parents himself, he was able to provide a detailed picture about the culture of the deaf community and other relevant factors.
Finally, having personal familiarity with being a child of deaf parents, Dr. Marcus was able to provide a fuller picture of the relationship between deaf parents and hearing children and the subsequent rejection of older hearing children from the deaf community. Generally, when deaf adults have infants, there is not much separation between parent and child. However, once a child is able to communicate with the hearing world, he or she would be expected to become an adult for his parents, despite the child’s very young age.
Many children of deaf parents are forced to help their parents navigate through the hearing world, including helping them obtain Social Security benefits or helping them to deflect any possible trouble with the law. For example, if the child is being required to intervene when his or her parents are involved with a police officer, the child would not tell the officer the truth, but would protect his or her parents. Thus, the families do not obtain the help they need. If a police officer were to encounter a child who was abandoned at the mall by a parent, like the situation that occurred to Woodel, the child would not tell the officer the truth, but would lie for *819 the parent and say that he or she simply got lost.
Despite this close attachment to the deaf community as a child, however, based on the mistrust of the hearing world, as a hearing child gets older, he or she could end up being excluded from the deaf world. Thus, children of deaf parents often feel they have no place where they belong. In Woodel’s case, he was abandoned by both his family and the deaf community, which was the society in which he grew up. For Woodel and his sister, being a part of the deaf world was a part of their identity. Woodel and his sister tried to sign at the Children’s Home in order to keep their identity as a part of the deaf world, but they were punished because others thought that they were keeping secrets.
Not only did postconviction counsel present evidence at the evidentiary hearing as to this important factor, but counsel also presented other significant mitigation, including that all of Woodel’s siblings, including his two half-brothers, had significant addiction problems; that Woodel’s parents had serious addiction and physical abuse problems; and that Woodel’s half-brother had been raped by his mother’s boyfriends, just like his sister had been— evidence that was important for the jury to hear because Woodel testified that he was unable to recall that period of his life and whether he had been raped.
Woodel also called Dr. Mark Cunningham, who testified that based on the numerous damaging developmental factors, the family history, the generational abuse, and the dysfunctions to which Woodel was exposed, this was one of the worst cases that he had encountered, and the lack of a proper mitigation investigation prior to the trial affected Dr. Dee’s ability to perform an adequate assessment. Specifically, Dr. Cunningham discussed the significant hereditary and genetic predispositions that impacted Woodel — Woodel had significant damaging developmental factors as he grew up, including being uprooted and moved at least twenty-seven times by the time Woodel was in middle childhood; Woodel suffered from deficient and disrupted attachment, emotional and physical neglect, probable sexual abuse, abandonment, and rejections and failures; and significant parental drinking and abuse. According to Dr. Cunningham, without this crucial information, the jury was left with a simple impression that Woodel’s life should be spared because he had a bad childhood, but the jury was never provided with over thirty well-articulated damaging developmental factors that impacted Woo-del and the generational abuse within his family that would have provided necessary information to show the significance of the mitigation and how it impacted him.
On too many occasions, this Court has addressed cases in which counsel failed to conduct a mitigation investigation until trial began — conduct that is clearly deficient and will have a significant impact on the case. See, e.g., Blackwood, v. State, 946 So.2d 960, 973 (Fla.2006) (affirming the trial court’s decision to grant a new penalty phase where counsel attempted to secure a mental health evaluation five weeks prior to trial but did not take sufficient actions when the expert declined to provide an evaluation shortly prior to trial based on a fee dispute, even though counsel then secured additional mental health mitigation at the Spencer hearing); State v. Coney, 845 So.2d 120, 129-133 (Fla.2003) (affirming the trial court’s decision to grant a new penalty phase where counsel attempted to secure mental health evaluations after the guilt phase and failed to adequately prepare); State v. Lewis, 838 So.2d 1102, 1112 (Fla.2002) (same); Deaton v. Dugger, 635 So.2d 4, 8 (Fla. *820 1993) (requiring a new penalty phase where trial counsel failed to investigate mitigation evidence prior to trial, resulting in his client waiving the presentation of mitigation altogether). Here, trial counsel likewise failed to conduct the mitigation investigation in a timely manner, and upon being given a second chance when a new penalty phase was ordered, made the unreasonable decision to not undertake any additional investigation because he decided he could simply rely on the testimony previously presented at the initial penalty phase.
During postconviction proceedings, however, current counsel discovered significant additional mitigation, some of which changes the very nature of the crime, and clearly could have impacted the jury’s bare majority seven-to-five recommendation. The bottom line is that trial counsel chose not to undertake a full mitigation investigation, which would have uncovered other important mitigation witnesses who were far more compelling than the witnesses that trial counsel utilized during the second penalty phase, who were simply recycled without any additional thought or analysis.
Accordingly, the failure to present the considerable mitigation that existed but was never pursued, due to the deficiencies of trial counsel, results in prejudice such that confidence in the outcome has been undermined. The trial court considered all of this evidence, asked careful and thoughtful questions throughout the evi-dentiary hearing, and analyzed all of the relevant information in an extensive eighty-six-page order. Based on the analysis above, I would affirm the trial court’s decision to grant a new penalty phase.

. In addition to the flawed legal analysis, the majority conflates deficiency and prejudice. See majority op. at 801-02. The majority also uses a harmless error standard when it should be applying a Strickland prejudice standard. See id. at 796-97, 798-99.