# Supreme Court of Florida

_____

No. SC20-284
_____

**MICHAEL A. GORDON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

September 1, 2022

COURIEL, J.

Michael A. Gordon appeals his convictions and sentences of death for the January 15, 2015, first-degree murders of Patricia Moran and Deborah Royal.  We have jurisdiction.  Art. V, § 3(b)(1), Fla. Const.  We affirm Gordon's convictions and sentences.

**I**

The victims in this case were murdered at home, seemingly at random, having had no connection to the pawnshop robbery that unfolded earlier on the day they died.

## A

Shortly after 5:30 p.m. on January 15, 2015, Chad O'Brien, the manager of a Cash America Pawnshop in Auburndale, in Polk County, and Richie Soto, one of his pawnbrokers, were talking in the store's office when three armed men rushed into the store, demanding at gunpoint that O'Brien and Soto get down. Gordon, one of those armed men, pointed a rifle at O'Brien; another pointed a handgun at Soto.

After noticing O'Brien's keys, Gordon threatened to kill O'Brien if he did not immediately unlock the case. O'Brien complied. Gordon and an accomplice with a crowbar began stuffing jewelry into a bag. When the robber with the handgun yelled that they were out of time, the three men grabbed their loot and bolted from the store. They loaded into a red SUV idling outside and fled in the direction of Haines City.

Back at the pawnshop, Soto called 911 and reported the robbery, which the store's security cameras had captured. Some of the stolen jewelry contained GPS tracking devices that had been activated when the items were removed. The Polk County Sheriff's

Office had access to the devices' tracking system and officers were immediately sent to follow the items' GPS signals.

Three Haines City Police Department officers responded to radio calls that the fleeing SUV was headed their way. As the officers closed in on it, someone in the SUV opened fire on them, with one shot striking a patrol car. The SUV continued to race toward Haines City, its occupants continually firing at the pursuing officers. When two more officers joined the chase, another patrol car was hit. The SUV was speeding and evasively weaving in and out of traffic. At last, it made a sharp left turn, nearly tipping over in the process, drove through a grass median, and pulled into the Chanler Ridge subdivision in Haines City.

Officers followed the SUV into the neighborhood, where it had foundered in a field. Its occupants fled in several directions. One man was tracked down by a police dog. Two men had better luck and avoided detection at the scene but were arrested the following morning.

Meanwhile, one block away, three Chanler Ridge residents had stepped outside to see what was going on and spotted a man running. He identified himself as a neighbor and said that he was

fleeing people who were trying to shoot him. The residents were suspicious; they did not recognize him. One ran to flag down the police officers who were swarming the subdivision. Seeing this, the unrecognized man fled toward Astor Drive. Hearing the sirens, additional neighborhood residents gathered and noticed clothes strewn across multiple yards. One of the residents who had earlier encountered the stranger found a rifle in their yard and called 911. An officer's police dog tracked the scent from the items to 618 Astor Drive.

While the residents who had encountered the stranger were calling 911, a different resident called the authorities to report that she heard screaming from her neighbors' house—at 618 Astor Drive. Officers formed a perimeter around the house. It was then dark enough that the police had started using their flashlights. While searching the fenced-in backyard of the house, two officers pointed their lights through a window to see inside the house. Two unclothed women with serious lacerations lay motionless on a bloody floor. The officers yelled out what they saw to nearby colleagues and their discovery was soon broadcast over the radio to all officers on the scene.

Deputy Jonathan Quintana-Rivera was standing in the driveway guarding the front of the house. Officer Eric Nickels was in the street, about 35 feet from the garage door, near the curb. Other officers were preparing to enter the house. From inside a closed garage they heard loud noises followed by the revving of a car engine, then the sound of squealing tires. Gordon, at the wheel of the victims' car, burst through the closed garage door. The garage door collapsed on top of the car, staying on its roof while the car careened down the driveway.[1]

To avoid being hit by the car, Deputy Quintana-Rivera dove from the driveway onto the lawn. The garage door on top of the car blocked Deputy Quintana-Rivera's view of the driver. Officer Nickels, trying to get out of the car's path, scrambled toward the lawn but fell down in the road. Before he could get up, the car made a hard left out of the driveway and began accelerating towards him. Officers began firing at the car. Even though Officer

---

1. While the officers' testimonies disagreed about whether the car came out headlights or taillights first, their testimonies were consistent that it rapidly accelerated to about 35 to 40 miles per hour.

Nickels could not see who was driving, he aimed for the car's windshield, trying to hit the driver. The car sped down Astor Drive past Officer Nickels, made a sharp right turn, and crashed to a halt in a nearby field.

An officer and his police dog apprehended Gordon about 60 to 75 feet from the crashed vehicle. Gordon was handcuffed, placed in a patrol car, and read his rights. Following *Miranda*[2] warnings, Gordon told officers that a man named Tony Wright, as well as two of Wright's family members, were still in the house at 618 Astor Drive.

While Gordon was being arrested, a SWAT team was clearing the house. They found no other suspects, but they did find the remains of 72-year-old Patricia Moran and her 51-year-old daughter, Deborah Royal. Their throats had been slashed, their

---

2. *Miranda v. Arizona*, 384 U.S. 436, 467-71 (1966) ("At the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent. . . . The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. . . . [A]n individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation . . . .").

bodies repeatedly stabbed. Several knives were scattered near the bodies. There was blood throughout the house; two T-shirts in the washing machine were covered in blood that was later identified as Gordon's. Medical examiners later concluded that neither woman died immediately. Each had defensive wounds indicating she attempted to defend herself before she died from the attack.

**B**

The State charged Gordon in a 15-count indictment for the events of January 15. The offenses included: two counts of first-degree murder, burglary with assault or battery, conspiracy to commit armed robbery, robbery with a firearm, grand theft, fleeing or attempting to elude, three counts of attempted first-degree murder with a firearm, three counts of attempted first-degree murder with a vehicle, grand theft of a vehicle, and possession of a firearm by a convicted felon.[3]

During jury selection, the assistant state attorney asked members of the venire to raise their hands if someone close to them had ever been charged with a crime. Kimberly James was among

_____

3. This final charge, possession of a firearm by a convicted felon, was severed before trial and is not before us on appeal.

the potential jurors who did. She explained that her first cousin had been sentenced to 25 years in prison, "[b]ut it didn't affect me." When asked if there was "anything about that incident that would impact [her] ability to be fair and impartial as it relates to this case," she answered "[d]efinitely not."

At a different point in voir dire, the State asked James whether she ever had any casual conversations with anyone about the death penalty. "No," she said. Asked whether her jury service at this trial had been the first time she had ever really thought about death penalty, James said that she had considered the subject "thinking to myself," perhaps while watching crime-related news. Asked what her thoughts about the death penalty were when she saw news about it, she said, "sometimes it's merited and sometimes it's not . . . I'm not there to look like at evidence to see whether the person should die, you know. I'm not God."

The State followed up by asking whether her use of the phrase, "I'm not God," was a reference to a religious belief. James replied, "It has nothing to do with religion. It's just how I am as a person. I want to see the evidence. If it warrants death, so be it. If it warrants life, life." Asked if she would like to serve on the jury,

James said she would. Counsel for the State and for Gordon went on to conduct an extensive colloquy with members of the panel, including James, on a number of topics.

The State ultimately exercised one of its peremptory strikes to remove James—who, like Gordon, is black—from the panel. Gordon's counsel asked the State to supply a race-neutral reason for the strike. The State replied that James's statement, "I'm not God," caused concern about whether she could be fair and impartial in determining whether the death penalty was appropriate in this case. At that point, Gordon's counsel stated that the State's reason for striking James was not sufficiently race-neutral.

Applying a version of the procedure required under the circumstances in a *Melbourne*[4] and *Batson v. Kentucky*, 476 U.S. 79

---

4. *Melbourne v. State*, 679 So. 2d 759, 764 (Fla. 1996) ("A party objecting to the other side's use of a peremptory challenge on racial grounds must: a) make a timely objection on that basis, b) show that the venireperson is a member of a distinct racial group, and c) request that the court ask the striking party its reason for the strike. If these initial requirements are met (step 1), the court must ask the proponent of the strike to explain the reason for the strike. At this point, the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If the explanation is facially race-neutral and the court believes that, given all the circumstances surrounding the

(1986), challenge, the trial court found that Gordon was black; that the venire member in question, James, was black, and that an already-seated juror appeared to be black. Next, the trial court considered the State's explanation for striking James. It said, "the Court is not persuaded that the comments taken, all the answers and responses given by Ms. James to the questions both by the State and defense, I do not find that what she said and the reason articulated by the State is sufficient to allow the cause[5] challenge."

strike, the explanation is not a pretext, the strike will be sustained (step 3). The court's focus in step 3 is not on the reasonableness of the explanation but rather its genuineness.") (footnotes omitted).

5. Moments later, the trial court correctly referred to the strike as a "peremptory challenge" rather than a cause challenge. Notably, at the time of the initial peremptory challenge, the trial court only ruled on "whether the neutral explanation is facially valid," not exactly what we have held to be required—that is, whether the proffered reason is pretextual. *Melbourne*, 679 So. 2d at 764 ("If the explanation is facially race-neutral and the court believes that, given all the circumstances surrounding the strike, the explanation is not a pretext, the strike will be sustained."); *Batson*, 476 U.S. at 98 ("The prosecutor therefore must articulate a neutral explanation related to the particular case to be tried."); *United States v. Houston*, 456 F.3d 1328, 1338 (11th Cir. 2006) ("Once the prosecution has offered a legitimate, non-discriminatory reason for exercising its strikes, . . . the party contesting the strike [bears the burden] to demonstrate that the prosecution's stated reasons are pretextual.").

When a panel of 12 jurors had been assembled, the State again moved to strike James. The trial court asked whether the State had any additional grounds. The State answered that James had also indicated during voir dire that her first cousin had been sentenced to 25 years in prison. The State reasserted its initial reason for striking James, arguing that only James among the potential jurors earlier said, "I'm not God," which to the State "indicate[d] that she's saying to us, 'Who am I to judge somebody or be a part of a process that the death would be imposed? That's God's job, not anybody else's.'" Gordon's counsel renewed its argument that the State's proffered reasons for the strike were not race-neutral. The trial court deferred ruling on the matter, stating it would review its notes in addition to what was being presented by the State and the defense.

After seating the other jurors, the trial court stated it had "considered the totality of the circumstances . . . and particularly the second reason for the peremptory strike to Ms. James," and granted the State's request to strike Ms. James over the defense's objection.

After the jury had been selected, defense counsel accepted the jury, but renewed all race- and gender-related challenges it had made during the voir dire process. Gordon himself was sworn and stated that, other than the objections made on his behalf by his counsel, he had no objections to the panel as selected.

Trial proceeded, and at the conclusion of the State's evidence, Gordon moved for judgment of acquittal. The trial court granted the motion as to one count of attempted murder with a vehicle because the officer that the count concerned had previously died from unrelated causes.

Gordon's counsel did not concede that Gordon participated in any of the charged offenses. For the murders of Moran and Royal, Gordon's counsel argued that Tony Wright, or a different man from the fleeing SUV who was not arrested until the next day, could have killed the two women. The two neighbors who encountered a suspicious man outside their houses identified Tony Wright when shown photo packs and testified to that effect later at trial. This identification was confirmed by the officer who showed both neighbors the photo packs. Gordon's counsel also contended that numerous gaps existed in the police perimeter around 618 Astor

Drive. These gaps, Gordon's lawyers argued, could have allowed somebody to escape. They also hypothesized that the murders may have occurred before officers surrounded the house.

Following closing arguments, the trial court instructed the jury. Guilty as charged, came the verdict, as to the thirteen counts against Gordon that had not been dismissed or severed.

At the penalty phase, the State sought the death penalty arguing that four aggravating factors applied: (1) Gordon's conviction of a prior capital felony or other felony involving the use or threat of violence to a person; (2) the first-degree murders were committed while Gordon was engaged in burglary or flight after the commission of robbery with a firearm; (3) Gordon murdered both Moran and Royal to avoid or prevent a lawful arrest; and (4) the murders were committed in an especially heinous, atrocious, or cruel (HAC) manner. The State presented the testimony of an expert witness regarding the pain each victim suffered as a result of the injuries Gordon inflicted by repeatedly stabbing and cutting her with a knife while she remained alive, as well as victim impact statements, including photos, from family members and close family friends of the victims.

Gordon presented the testimony of six expert witnesses—a former prison warden, a neuropsychologist, a neurocognitive imaging specialist, a neurologist, a clinical pharmacologist, and a clinical and forensic psychologist—and that of Gordon's sister, Theresa Gordon. Several of the experts concluded that Gordon might have brain damage from the extensive abuse he endured as a child. The jury heard evidence that Gordon's IQ as measured when he was in the second grade was 80, and that a more recent adult IQ test had returned a score of 70.[6] Gordon's records showed a variety of mental health diagnoses, including schizophrenia, schizoaffective disorder depressive type, bipolar disorder, psychosis not otherwise specified (NOA), and posttraumatic stress disorder (PTSD). Gordon's sister testified to extensive emotional, verbal, physical, and sexual abuse and neglect that she and her brother endured at the hands of their father with the tacit consent of their mother. On

---

6. No specific IQ score automatically establishes that an individual is intellectually disabled. *Hall v. Florida*, 572 U.S. 701, 723 (2014). To be barred from receiving the death penalty due to intellectual disability, a defendant must exhibit (1) significantly subaverage general intellectual functioning, and (2) concurrent deficits in adaptive behavior, (3) that shall have manifested before age 18. § 921.137(1) Fla. Stat. (2013).

rebuttal, the State called Gordon's father David Michael Gordon, who denied that he had ever abused his children.

The jury unanimously found beyond a reasonable doubt that the four aggravating factors asserted by the State existed and that those aggravating factors outweighed the mitigating circumstances and recommended that Gordon receive the death penalty.

In its sentencing order the trial court found that all four aggravating factors applied to both murders. Additionally, the trial court found that Gordon established the following mitigating circumstances and assigned them the following weight: he was under the influence of extreme mental or emotional disturbance (little weight); he suffered from mental illness (little weight); he suffered from toxic stress syndrome (moderate weight); he was not receiving proper treatment (little weight); he was abused and abandoned by his family (little weight); and he was smoking synthetic cannabinoids[7] on the date of the murders (little weight).

---

7. Specifically, the trial court found that Gordon was smoking K2 or "spice" the day of the murders, both of which are street names for synthetic cannabinoids. This drug is ingested by smoking plant material that has been sprayed with additives or by using a liquid in an e-cigarette. *Synthetic Cannabinoids (K2/Spice)*

Next, the trial court found that Gordon failed to establish the following mitigating circumstances: his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirement of law was substantially impaired; he was an accomplice in the murders and his participation was relatively minor; and there were other factors in his background or life or the circumstances of the offense that should mitigate his sentence.

Based on the trial court's review of the evidence, its weighing of the aggravating factors and mitigating circumstances, its consideration of the jury's sentencing recommendation, and noting that it would reach the same conclusion even in the absence of the aggravator of avoiding or preventing a lawful arrest, the trial court sentenced Gordon to death for each murder on February 7, 2020. Gordon appealed his convictions and sentences on February 24, 2020. We denied Gordon's motion to reconstruct the record to reflect the races of certain venire members who later served on the jury. This appeal followed.

---

DrugFacts, Nat. Inst. on Drug Abuse (July 2020), https://nida.nih.gov/publications/drugfacts/synthetic-cannabinoids-k2spice.

## II

Gordon raises seven issues on appeal and the State raises one. Two issues raised by Gordon—the State's strike of juror Kimberly James and the sufficiency of the evidence supporting his convictions for attempted first-degree murder of Deputy Sheriff Quintana-Rivera and Officer Nickels—merit individualized discussion.

## A

Gordon argues that the State was impermissibly motivated by race when it struck venireperson Kimberly James from the jury, and that its proffered reasons for the strike were pretextual. We reject this argument as improperly preserved.

In *State v. Johnson*, we said, "[T]he party opposing a peremptory strike must make a specific objection to the proponent's proffered race-neutral reason for the strike, if contested, to preserve the claim that the trial court erred in concluding that the proffered reason was genuine." 295 So. 3d 710, 716 (Fla. 2020). A trial court's decision will only be reversed if it is clearly erroneous. *Rimmer v. State*, 825 So. 2d 304, 320 (Fla. 2002) ("[T]he trial court's decision turns primarily on an assessment of credibility and will be

affirmed on appeal unless clearly erroneous." (quoting *Melbourne*, 679 So. 2d 759, 764-65 (Fla. 1996))). Therefore, the defendant must create a record containing the legal grounds for his or her objection. *See Johnson*, 295 So. 3d at 714-15 ("If the opponent of a peremptory strike fails to challenge as pretext a proffered reason found to be race-neutral, then the trial court is usually left with nothing other than the legal presumption that the proponent exercised the strike for a genuine reason.").

Here, Gordon objected that the State's proffered reasons for its strike—first, James's "I'm not God" comment, and second, her statement during voir dire that her first cousin had been sentenced to 25 years in prison—were "insufficiently race-neutral." But the State's proffered reasons *were* facially race-neutral, and Gordon's objection did not put the trial court on notice of the argument he advances here—that the State's facially race-neutral reasons were pretextual, and why. "[P]roper preservation requires the following three steps from a party: (1) a timely, contemporaneous objection; (2) a legal ground for the objection; and (3) '[i]n order for an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or

motion below.'" *Fleitas v. State*, 3 So. 3d 351, 355 (Fla. 3d DCA 2008) (quoting *Harrell v. State*, 894 So. 2d 935, 940 (Fla. 2005)). Here, the second two requirements were lacking. The trial court must be presented with a reason to doubt the genuineness of the State's proffered race-neutral reason for a strike, for it is the genuineness of the reason upon which the trial court must rule. For this Court to meaningfully review a trial court's decision to allow a strike, the objecting party must specify its objection by giving some reasoning as to why the proffered reason for the strike is pretextual. Was it, for example, a consideration that would have applied to other members of the venire, some of whom were seated? Or was it a consideration that would not bear on the juror's ability to weigh the evidence as required? That cannot be said of Gordon's counsel's objection here, which did not put the trial court on notice as to the reason the challenged strike was allegedly a pretext for racial animus, and therefore did not contain a proper legal ground for the objection or a specific contention for us to review.

Next, Gordon compares James's voir dire responses with the responses of allegedly similarly situated venire members who ultimately served on the jury. But he makes this comparison for

the first time before us; Gordon failed to preserve for review a comparative analysis of venire members' responses to voir dire.

We have said that, for this Court to compare voir dire responses in a *Melbourne* appeal, the party must have raised the issue to the trial court. In *Hoskins v. State*, we found that, because "at trial Hoskins did not mention [the similarly situated] jurors . . . his [*Melbourne*] claim is waived as to these jurors." 965 So. 2d 1, 10 (Fla. 2007). Likewise, in *King v. State*, we said that, "[a]lthough King now contends that there were other jurors on the panel who [were similarly situated], defense counsel did not raise that challenge before the trial court. Accordingly, that challenge has also been waived." 89 So. 3d 209, 230 (Fla. 2012).

It was Gordon's burden to preserve a comparison of venire members' responses for our review. Despite multiple opportunities during jury selection, he failed to make that comparison, or to provide, in a manner amenable to our review, an explanation for why the State's proffered reasons for striking James were pretextual. For example, when the State accepted without objection each of the venire members who gave similar voir dire responses to James, Gordon could have noted that the State did not strike

people who had similar, or closer, relationships with incarcerated people than James. Or, when the trial court asked Gordon to accept the final jury panel, he could have analyzed any comparable responses from other members of the panel. Instead, Gordon made a blanket statement purporting to preserve all race- and gender-based challenges made during voir dire.

On this record, which contains no reasoned, preserved objection regarding the genuineness of the State's proffered race-neutral reason for a peremptory strike, we have no basis upon which to revisit the trial court's decision to seat the contested juror.

**B**

Gordon's challenge to the sufficiency of the evidence fails because competent, substantial evidence supports the jury's verdict finding him guilty of two counts of attempted first-degree murder with a vehicle. To sustain a conviction on appeal, there must be "substantial, competent evidence to support the verdict" with all evidence viewed "in the light most favorable to the State." *Bush v. State,* 295 So. 3d 179, 200-01 (Fla. 2020). Evidence is competent if it is "sufficiently relevant and material"; evidence is substantial if there is enough that "a reasonable mind would accept [the evidence]

as adequate to support a conclusion." *De Groot v. Sheffield*, 95 So. 2d 912, 916 (Fla. 1957), *cited with approval in Bush*, 295 So. 3d at 201. If "a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt," then the conviction must be upheld. *Bush*, 295 So. 3d at 201 (quoting *Rogers v. State*, 285 So. 3d 872, 891 (Fla. 2019)).

Of the three elements of attempted first-degree murder,[8] Gordon says that the State failed to produce enough evidence to prove one: that his actions were premeditated. Gordon is correct in describing the scene of the crime as chaotic, especially after he burst through the garage door. Both the officers he was later convicted of attempting to kill testified that they could not see who was driving the car—implying that Gordon could not see them either. Gordon argues that the evidence adduced at trial supports

---

8. The three elements of attempted first-degree murder are: "(1) an act intending to cause death that went beyond just thinking or talking about it; (2) premeditated design to kill; and (3) commission of an act which would have resulted in the death of the victim except that someone prevented the defendant from killing the victim or the defendant failed to do so." *Gordon v. State*, 780 So. 2d 17, 21 (Fla. 2001), *receded from on other grounds in Valdes v. State*, 3 So. 3d 1067, 1077 (Fla. 2009); Fla. Std. Jury Instr. (Crim.) 6.2; §§ 777.04, 782.04, Fla. Stat. (2015).

his claim, that he was trying to escape, just as readily as it supports the State's claim, that he purposefully attempted to hit the officers as he drove.

But this argument ultimately fails because it rests on a misunderstanding of what constitutes and what establishes premeditation. Premeditation is "understood as requiring proof that the defendant was aware of the consequences of the actions that caused death, and that the defendant had the opportunity for reflection prior to committing the fatal act." *Sparre v. State,* 164 So. 3d 1183, 1200 (Fla. 2015). Premeditation does not require lengthy deliberation on the part of the actor; the intent to commit potentially fatal acts "may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act." *Brown v. State,* 126 So. 3d 211, 221 (Fla. 2013) (quoting *Bradley v. State,* 787 So. 2d 732, 738 (Fla. 2001)). While Gordon's arguments center around his state of mind as he drove the car, there is competent, substantial evidence to support the jury's conclusion that Gordon had already formed the requisite intent before he left the garage.

Specifically, the State presented ample evidence to support the jury's finding that Gordon had sufficient time to reflect upon his plan to flee and realize the danger to others inherent in his plan. Gordon had been part of a high-speed police chase in the hours before the murders, so he knew officers were actively pursuing him. The jury heard that officers had shone flashlights through the windows of 618 Astor Drive onto the women's bodies, then shouted to one another outside of the house upon discovering the victims' bodies. From this evidence, the jury could permissibly infer that Gordon knew officers had tracked him down and surrounded the house. *See Walker v. State,* 957 So. 2d 560, 578 (Fla. 2007) (discussing evidence the jury could have relied on to make the inference that the killing was premeditated); *Bargesser v. State,* 116 So. 11, 12 (Fla. 1928) ("The jury are the judges of the reasonableness, probability, and credibility of the explanation offered by the defendant."); *Cnty. Court of Ulster Cnty. v. Allen,* 442 U.S. 140, 156 (1979) ("Inferences and presumptions are a staple of our adversary system of factfinding. It is often necessary for the trier of fact to determine the existence of an element of the crime— that is, an 'ultimate' or 'elemental' fact—from the existence of one or

more 'evidentiary' or 'basic' facts."). Still, in an attempt to escape, Gordon plowed the victims' car through the closed garage door with no warning. On this record, we cannot say that the jury lacked competent, substantial evidence to support its conclusion as to premeditation.

## C

We briefly address the other issues raised by the parties.

We reaffirm our decision in *Lawrence v. State* that the Eighth Amendment does not require comparative proportionality review of death sentences. 308 So. 3d 544 (Fla. 2020).

The trial court did not abuse its discretion when weighing the mitigating evidence in this case. A trial judge need not mention every relevant piece of evidence in mitigation to properly weigh aggravating and mitigating factors under our laws and the Eighth Amendment. *See Kansas v. Marsh*, 548 U.S. 163, 175 (2006) ("In aggregate, our precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence. The thrust of our mitigation jurisprudence ends here.") A sentencing order is valid when the

sentencing judge "expressly evaluate[d] . . . each statutory and non-statutory mitigating circumstance proposed by the defendant." *Woodel v. State,* 804 So. 2d 316, 326 (Fla. 2001) (quoting *Ferrell v. State,* 653 So. 2d 367, 371 (Fla. 1995)). While judges cannot merely list out the mitigators with no analysis, neither must they individually discuss each and every piece of evidence submitted for each mitigator. *See Woodel,* 804 So. 2d at 327 (rejecting a list-like sentencing order that engaged in no analysis and failed to assign weight to aggravators or mitigators).

In *Lowe v. State,* we upheld the trial court's weighing of mitigators where "it [was] apparent that the trial court considered each of the mitigating circumstances proposed by [the defendant] and determined that such circumstances hardly distinguished [the defendant] from other members of society, were supported by 'underwhelming' evidence, or were in fact not mitigating." 259 So. 3d 23, 64 (Fla. 2018). Here, too, the trial court identified the evidence that supported its conclusion regarding the assigned weight of each mitigator. It balanced that weight against that of the aggravating factors in the prescribed manner. On this record, we

find no abuse of discretion in the trial court's evaluation of aggravation and mitigation.

We have previously held that the Eighth Amendment's prohibition of cruel and unusual punishment does not require a categorical bar against the execution of persons who suffer from any form of mental illness or brain damage. *McCoy v. State,* 132 So. 3d 756, 775 (Fla. 2013). The Eighth Amendment broadly protects two classes from execution: people who are intellectually disabled and minors. *Atkins v. Virginia,* 536 U.S. 304 (2002) (intellectual disabilities); *Roper v. Simmons,* 543 U.S. 551 (2005) (minors). Gordon's argument that the Eighth Amendment prohibits his execution because he is mentally ill and brain damaged is without merit. At trial, the testifying expert diagnosed Gordon with attention deficit hyperactivity disorder (ADHD), PTSD from severe childhood abuse, and schizoaffective disorder depressive type. The trial court heard evidence that Gordon tested to an IQ of 70, borderline to the threshold for an intellectual disability. It also heard testimony from experts that brain imaging showed Gordon had suffered extensive traumatic brain injury earlier in life, and that he likely suffers from chronic traumatic encephalopathy, which

is caused by repeated head trauma and leads to neurological deterioration.

Yet we have held that, for the purposes of the Eighth Amendment, the existence of a traumatic brain injury does not reduce an individual's culpability to the extent they become immune from capital punishment. *Johnston v. State,* 27 So. 3d 11, 26-27 (Fla. 2010) (emphasizing this Court has repeatedly rejected the argument "that defendants with mental illness must be treated similarly to those with mental retardation because both conditions result in reduced culpability"); *Connor v. State,* 979 So. 2d 852, 867 (Fla. 2007) ("To the extent that Connor is arguing that he cannot be executed because of mental conditions that are not insanity or mental retardation, the issue has been resolved adversely to his position.").[9]

---

9. *See also Carroll v. State,* 114 So. 3d 883, 887 (Fla. 2013) ("Additionally, in [Carroll's] habeas corpus proceeding in federal court, Carroll claimed that he is mentally ill and, under the rationale of *Atkins,* persons who are unable to control their conduct due to mental illness act with lesser moral culpability and should be exempt from execution. The Eleventh Circuit Court of Appeals refused to extend *Atkins* to mentally ill persons absent a decision from the United States Supreme Court barring execution of the mentally ill. Thus, Carroll's claim in this proceeding that he is less

The evidence that Gordon committed the murders of both Patricia Moran and Deborah Royal is sufficient to sustain his convictions. In appeals contesting a death penalty sentence, Florida Rule of Appellate Procedure 9.142(a)(5) and our precedent create "a mandatory obligation to determine the sufficiency of the evidence to sustain [a] homicide conviction." *Truehill v. State*, 211 So. 3d 930, 951 (Fla. 2017) (quoting *Jones v. State*, 963 So. 2d 180, 184 (Fla. 2007)). In conducting a sufficiency review, we view the evidence "in the light most favorable to the State to determine whether a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." *Cozzie v. State*, 225 So. 3d 717, 733 (Fla. 2017) (quoting *Rodgers v. State*, 948 So. 2d 655, 674 (Fla. 2006)). Here, there is competent, substantial evidence to support Gordon's convictions for first-degree murder. The DNA analysis, witness testimony, police dog tracking, and Gordon being the only living person found within the police

---

culpable because of his mental illness and should be treated similarly to the classes of persons protected by *Atkins* and *Roper* is procedurally barred. Even if not untimely and procedurally barred, this Court has rejected similar claims on the merits in the past.") (citation omitted).

perimeter all strongly support the jury's verdict that Gordon murdered Patricia Moran and Deborah Royal. Accordingly, sufficient evidence exists to sustain his homicide convictions.

## III

We affirm Gordon's convictions and sentences of death.

It is so ordered.

MUÑIZ, C.J., and CANADY, POLSTON, and GROSSHANS, JJ., concur.
LABARGA, J., concurs in result with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in result.

Because I continue to adhere to my dissent in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020), wherein this Court abandoned this Court's decades-long practice of proportionality review in direct appeal cases, I can only concur in the result.

Further, because I agree that Gordon failed to properly preserve the *Melbourne*[10] issue with respect to juror James, I concur in the result.

---

10. *Melbourne v. State*, 679 So. 2d 759 (Fla. 1996).

An Appeal from the Circuit Court in and for Polk County,
Jalal A. Harb, Judge
Case No. 532015CF000476A000XX

Howard L. "Rex" Dimmig, II, Public Defender, and Steven L. Bolotin, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida,

for Appellant

Ashley Moody, Attorney General, Tallahassee, Florida, and Rick A. Buchwalter, Assistant Attorney General, Tampa, Florida,

for Appellee